W.C. PHILLIPS and Mary Phillips, d/b/a Ambusher, Inc., Plaintiffs–Appellees,

v.

Claude FREY, Jr., et al., Defendants,

Claude Frey, Jr., Gary Arnold, and Buck–Pro, Inc., Defendants–Appellants.

No. 93–5162.

United States Court of Appeals, Fifth Circuit.

May 11, 1994.

---

Marvin C. Moos, Timothy P. Herron, Wetzel, Herron & Drucker, L.L.P., Houston, TX, for defendants-appellants.

Bruce A. Condit, Condit, Peek & Young, Texarkana, TX, for plaintiffs-appellees.

Before ALDISERT *, REYNALDO G. GARZA, and DUHÉ Circuit Judges.

* Circuit Judge for the Third Circuit, sitting by designation.

1. To assemble a single-pole deer stand, the ladder pole sections are connected together, the seat section is attached to the top of the poles, and the stand is secured against a tree with a rope. There are jaws on the back of the seat that dig into the tree to help hold the stand securely. The hunter may then climb steps built into the ladder pole sections to reach the seat for gun or bow hunting.

**REYNALDO G. GARZA, Circuit Judge:**

This is an appeal from a jury verdict in a trade secret misappropriation case. The jury found that the defendants had misappropriated a trade secret connected with the manufacture and/or marketing of the plaintiffs' hunting stand. For the following reasons, we AFFIRM.

## STATEMENT OF FACTS

Plaintiffs-appellees, W.C. Phillips and his wife Mary Phillips, are owners and operators of Ambusher, Inc. Ambusher's main line of business is the manufacture and distribution of single pole deer stands to be used by hunters. Ambusher's stand is collapsible and consists of four main parts: the upper seat section and three ladder pole sections that enable the seat to be elevated approximately fourteen feet above the ground.[1] It has a unique design in that it has a single pole that a hunter can climb instead of having to climb the tree. For further safety and security, it locks to the tree from the ground before a hunter climbs into it.

W.C. Phillips began developing single pole tree stands in 1967. He worked on their design, off and on, for three years. He has developed a number of different models over the years culminating in the "V–Lok" tree stand which is the subject of this suit.[2] Ambusher also sold accessories to be used with the deer stands, including a gun/bow rest, a camo blind, a camo awning, a security cable, and an ATV "Piggy Back Bar." Ambusher and Buck Pro, Inc. are the only manufacturers of single pole tree stands in the United States. Buck Pro's tree stand is an exact copy of appellees' "V–Lok" tree stand.

Defendant John Collins[3] was a customer who had bought products from appellees for

2. The previous models had double arms that locked around the tree, while the V–Lok has only one arm which gives the hunter the advantage of going around the tree twice with a rope making it even more secure.

3. Collins settled on the morning of the second day of trial.

a number of years. The events which form the basis of this suit began in the summer of 1990, when Collins and Phillips had a telephone conversation wherein Phillips mentioned his desire to sell the business, including all equipment, jigs, logos, and the spec book, for $140,000.[4] Two weeks after that initial telephone call, Collins called Phillips back to inform him that he and two associates, Claude Frey and Gary Arnold, were interested in purchasing the business and wanted some information to look at. Collins informed Phillips that coming up with his asking price would not present a problem since he had $50,000 in savings, that Arnold already had a metal fabricating ship, and that Frey owned land. These facts led Phillips to believe that the defendants were legitimate prospective purchasers of Ambusher, Inc.

A couple of weeks later, on July 6, 1990, Phillips sent some information for Collins and his two associates to look over. This package included both a financial statement, and an inventory of his equipment and tools by make and model. He also included a video tape. Phillips wrote that he had a specification book that is referred to each time a component is made that is kept up to date and put away for safekeeping. He also stated that he had made a videotape of the component manufacturing the previous year, adding "[w]ithout the specs this information is no secret, and if you and your associate would like to view this for a detailed insight of the manufacturing procedures, I can send a copy to you.... This tape does not cover recent developments and the V–Lok stand." Because he felt the tape did not make sense without the "spec. book," Phillips made a different tape on July 7, 1990 demonstrating Ambusher's manufacturing process for tree stands and accessories. The video tape gave appellants the knowledge necessary to manufacture tree stands, and was intended to bypass the spec book. Phillips did this in order to allow appellants to evaluate the business as prospective purchasers.

In the latter part of July 1990, Collins called to arrange a tour of appellees' shop in Texarkana. The tour lasted about three hours. During the tour, Phillips and his employee showed the defendants first hand how to manufacture the "V–Lok" deer stand.

Two weeks later, some time in August 1990, Collins and appellants returned to Texarkana for a second visit. Collins purchased seven V–Lok stands and returned to Louisiana. On September 10, 1990, Phillips sent a more recent financial statement and a copy of the current inventory.

Shortly thereafter, Collins informed Phillips that he and appellants were having problems securing financing. Collins then made a counteroffer for the business for $30,000 down, a $10 royalty per stand and that Phillips was to help set up shop in Wisner, Louisiana. On September 14, 1990, Phillips refused this counteroffer. On September 15, 1990, Phillips offered to sell the business for $45,000 down and $20,000 per year at 10% interest for seven years. On October 1, 1990, Collins informed Phillips that he and appellants would be unable to purchase the business.

Collins returned the information Phillips had sent him, except for the video. However, none of the information Collins sent to Frey or Arnold was returned. Moreover, it was later discovered that appellants never attempted to secure a loan for the purchase of Ambusher, despite having sufficient assets to do so.

By the end of March, 1991, appellants were manufacturing and marketing a tree stand known as the "BP91" under the name Buck–Pro, Inc. The tree stand and accessories were identical to plaintiffs' "V–Lok" tree stand and accessories. The plaintiffs filed an action against appellants and John Collins in district court alleging misappropriation of both the design of the product and Ambusher's manufacturing process; that the appellants deceived the Phillips into disclosing confidential trade secrets under the guise of purchasing the business. Appellants denied these allegations, stating that the BP91 deer stand was designed by permissible reverse engineering, and counterclaimed against appellees for malicious prosecution. The jury verdict awarded appellees $56,500.13 in actu-

---

4. The sales price included everything but Appel- lees' building in Texarkana.

al damages, $75,000 in punitive damages, and $7,000 in attorneys' fees. The jury found against the appellants on the malicious prosecution claim. On the same day that the judgment was entered, the trial court signed a permanent injunction enjoining appellants from manufacturing, selling, or marketing deer stands and assorted accessories. Appellants have timely appealed.

## DISCUSSION

The jury returned a verdict finding by a preponderance of the evidence that the defendants had misappropriated a trade secret of W.C. Phillips and Mary Phillips connected with the manufacture and/or marketing of a single pole V–Lok tree stand, T–Bar awning, or Piggy back bars for all terrain vehicles.[5]

■ Trade secret misappropriation under Texas law is established by showing: (a) a trade secret existed; (b) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (c) use of the trade secret without authorization from the plaintiff. *Taco Cabana Intern'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir.1991), *affirmed,* —— U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Hurst v. Hughes Tool Co.*, 634 F.2d 895, 896 (5th Cir.), *cert. denied,* 454 U.S. 829, 102 S.Ct. 123, 70 L.Ed.2d 105 (1981); *Avera v. Clark Moulding*, 791 S.W.2d 144, 145 (Tex. App.—Dallas 1990, no writ).

■ The decisive component of our review of this case is the fact that the defendants failed to move for a judgment as a matter of law at the close of the evidence or after the verdict was returned. *See* Fed.R.Civ.P. 50. Consequently, these objections are being raised for the first time on appeal, and our review is therefore extremely limited: "It is the unwavering rule in this Circuit that is-

sues raised for the first time on appeal are reviewed only for plain error," and we will reverse "only if the judgment complained of results in a 'manifest miscarriage of justice.'" *McCann v. Texas City Refining, Inc.*, 984 F.2d 667, 673 (5th Cir.1993) (quoting *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 297 (5th Cir.1978)). Therefore, the appellants have waived the right to appeal the sufficiency of the evidence, and may only complain of the legality of the verdict, i.e., whether there is *any* evidence to support the jury verdict.[6] *McCann*, 984 F.2d at 673. Even if there is no evidence in the record supporting the verdict, this Court lacks the power to enter judgment for the appellant. Our appellate relief is limited to ordering a new trial. *Id.*

It is the appellants' contention that there was no evidence to support the jury's verdict or the permanent injunction. Appellants' first argument is that no "trade secrets" were disclosed. Appellants assert that they acquired no information deserving protection under the trade secrets law. Alternatively, appellants claim that the plaintiffs are barred as a matter of law because the Buck–Pro BP91 was built exclusively through the use of permissible reverse engineering, that the Phillips failed in their affirmative duty to take reasonable steps to protect their secret, and finally, that no confidential relationship existed between the parties. Consequently, the jury's finding of misappropriation of trade secrets amounts to a "miscarriage of justice." We will examine each of these concerns independently, closely scrutinizing the record for any evidence to support the jury's verdict.

### (1) Did a Trade Secret Exist?

Primarily, appellants assert that the only trade secret involved in this case was the specification book, and that was never given to the appellants. Any information other

---

**5.** The jury was instructed that in order to find that the defendants misappropriated the plaintiffs' trade secret, they must find each of the following elements by a preponderance of the evidence:
 1. that a trade secret exists;
 2. that it was acquired through a confidential relationship; and
 3. that the defendants used the trade secret without authorization from the plaintiffs.

**6.** Appellants timely filed a motion for new trial in this case so this court may inquire whether the trial court abused its discretion in overruling the motion for new trial. *Little v. Bankers Life & Cas. Co.*, 426 F.2d 509, 511 (5th Cir.1970). We hold that the trial court did not abuse its discretion in denying the motion.

than the spec book would not rise to the specter of a "trade secret." Appellants point out that Phillips stated in his letter that "[w]ithout the specs this information is no secret...." Moreover, appellants claim that no admonitions against disclosure accompanied the videotape.

■ A trade secret is any formula, pattern, device or compilation of information used in a business, which gives the owner an opportunity to obtain an advantage over his competitors who do not know or use it. *Taco Cabana Intern'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir.1991), *affirmed*, —— U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Avera v. Clark Moulding*, 791 S.W.2d 144, 145 (Tex.App.—Dallas 1990, no writ). "It may be a formula for a chemical compound, *a process of manufacturing*, treating or preserving materials, a pattern for a machine or other device, or a list of customers." Restatement of Torts § 757 comment b (1939) (emphasis added); *Avera v. Clark Moulding Co.*, 791 S.W.2d 144, 145 (Tex. App.—Dallas 1990, no writ). *See Chandler v. Mastercraft Dental Corp. of Texas Inc.*, 739 S.W.2d 460, 468 (Tex.App.—Fort Worth 1987, writ denied) (stating that plaintiff need not prove substantial element of secrecy, where evidence showed defendant formed a competing business utilizing processing and manufacturing system improperly obtained from plaintiff).

■ Appellees contend, and we find that the evidence supports, that it was Ambusher's manufacturing process that was the trade secret misappropriated, not the design of the tree stand.

■ The method of manufacturing must be a trade secret to be protected, in other words, it must give the owner a competitive advantage. *See Cataphote Corp. v. Hudson*, 444 F.2d 1313, 1318 (5th Cir.1971) (holding plaintiff failed to establish that glass bead manufacturing process involved some element above ordinary mechanical commonality). The trade secret "must possess at least that modicum of originality which will separate it from everyday knowledge." *Id.* at 1315. The record before us indicates that the Phillips's manufacturing process took years to develop and allowed Ambusher to manufacture the tree stands in a cost efficient manner, giving Ambusher a competitive advantage over anyone who would not know or use this method.[7] *See Taco Cabana Intern'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir.1991), *affirmed*, —— U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). The manufacturing process itself was divulged in both the video tape and the personal tours given to appellants during the course of negotiations for purchase of the business.[8]

Gary Arnold admitted at trial that prior to seeing the video tape sent to them by Phillips, he was unaware of how to mass produce deer stands. Additionally, the manufacturing equipment and tools used in Buck–Pro's manufacturing process were identical to those employed by Ambusher. This is some evidence that the manufacturing process came from improperly acquired trade secrets.

■ Secondly, appellants contend that the concept of a single-pole deer stand was not invented by Phillips, but was in fact the

---

7. When Phillips informed the appellants that his tree stand and accessories were not patented, Frey asked Phillips what he would do if someone started building them. Phillips replied that it would be cost prohibitive to do so without knowledge of his manufacturing process.

8. Phillips trial testimony states that the video disclosed the manufacturing process to appellants:

Q: Now what was on the tape that you actually sent?

A: Well, first I took a walk through the shop so they could get an overview of all the equipment. I showed each individual piece of equipment, and I showed the bender and told the name. I showed the hydraulic presses. I even showed how they worked.

I showed the saw, and the drills and the painting department, the assembly department, and just a tour through the entire facility. And then I wanted to show them how the equipment was used, and I went back and edited on some videotape showing people at work, showing the hydraulic press extruding or expanding the metal.

I showed them how to put foam on the gun rest. I showed them how to form the base pole for the flange. I showed them how to crimp the metal. I showed them how to cut the foot stand and fold it up. And just—just about everything that we did in production was included on this tape.

subject of a previous patent, thus rendering the trade secret public property through general disclosure. *Luccous v. Kinley Co.* 376 S.W.2d 336, 340 (Tex.1964) (patent grant automatically constitutes full disclosure of a patented process and cannot be protected as a trade secret). Appellants argue that any property rights in a trade secret cease to exist prospectively once the matter has become public property through a general disclosure by the discoverer or by the legitimate discovery of and/or rightful disclosure to another. *Basso Chemicals, Inc. v. Schmidt,* 522 F.Supp. 1087, 1092 (E.D.Ark.1981). On October 16, 1984, Lynn Thomas filed a patent for a "Portable Hunter Tree Stand." That patent provides:

A pair of spike-equipped jaw members which are pivotally coupled to the seat frame extended rearwardly therefrom and are normally biased apart to a fully open, tree-engaging position. The jaw members include integral, outwardly diverging locking arm portions which are adapted to be drawn together by the hunter with a rope during stand installation to forcibly compress the jaw members in binding, substantially circumferential engagement with the selected tree.

Whether the patented tree stand and the V–Lok stand are the same is irrelevant to our inquiry. We find that the jury's verdict can be supported by the misappropriation of the manufacturing process itself, which evidence in the record reveals gave Ambusher a competitive advantage over anyone who does not know or use it. Nowhere do appellants allege that they used the patent instead of the plaintiffs' trade secret to formulate their manufacturing process. The patent referred to merely describes a product, admittedly similar to the V–Lok Tree Stand, yet is devoid of detailed information of a manufacturing process or specifications.

In the same vein of argument, the appellants assert that they designed and manufactured their products by reverse engineering. Under Texas law, it is permissible to use a competitor's secret process if the process is discovered by reverse engineering applied to the finished product. *E.I. duPont deNemours & Co. v. Christopher,* 431 F.2d 1012, 1015 (5th Cir.1970), *cert. denied,* 400 U.S. 1024, 91 S.Ct. 581, 27 L.Ed.2d 637 (1971). Since they never had access to the spec book, it was necessary to compile their own specification for the deer stands and accessories. Appellants claim that Phillips admitted that they utilized reverse engineering to design their products when he testified:

A: They manufactured without my book, yes.

Q: And how did they do that?

A: They laid the stand down and measured it and copied it, and built some specs to match.

Q: Not from your book but from the stand itself?

A: From the stand itself, yes, sir.

Although it is likely appellants used reverse engineering for the design of the BP91, there was no evidence that the appellants used this method to acquire the manufacturing process employed by Ambusher. A process or device may be a trade secret even where others can gain knowledge of the process from studying the manufacturer's marketed product. *Ventura Manufacturing Co. v. Locke,* 454 S.W.2d 431, 433 (Tex.Civ.App.—San Antonio 1970, no writ). Although trade secret law does not offer protection against discovery by fair and honest means such as independent invention, accidental disclosure, or "reverse engineering," protection will be awarded to a trade secret holder against the disclosure or unauthorized use by those to whom the secret has been confided under either express or implied restriction of nondisclosure or by one who has gained knowledge by improper means. *Kewanee Oil,* 416 U.S. at 475, 94 S.Ct. at 1883. *See Carson Products Co. v. Califano,* 594 F.2d 453, 461 (5th Cir. 1979); *Weed Eater, Inc. v. Dowling,* 562 S.W.2d 898, 901 (Tex.Civ.App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.); *Brown v. Fowler,* 316 S.W.2d 111, 115 (Tex.Civ.App.—Fort Worth 1958, writ ref'd n.r.e.). Therefore, this argument does not further their position on appeal.

(2) Breach of Confidential Relationship and Improper Discovery

One is liable for disclosure of trade secrets if (a) he discovers the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in one who is in a confidential relationship with another who discloses protected information to him. *Mercer v. C.A. Roberts Co.*, 570 F.2d 1232, 1238 (5th Cir.1978); *E.I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1014 (5th Cir.1970), *cert. denied*, 400 U.S. 1024, 91 S.Ct. 581, 27 L.Ed.2d 637 (1971); *Murrco Agency, Inc. v. Ryan*, 800 S.W.2d 600, 605 (Tex.App.—Dallas 1990, no writ); *Elcor Chemical Corp. v. Agri–Sul, Inc.*, 494 S.W.2d 204, 211 (Tex.Civ.App.—Dallas 1973, writ ref'd n.r.e.).

The appellants assert that, even if the information disclosed was a trade secret, the information was not discovered through improper means. *E.I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1014 (5th Cir.1970), *cert. denied*, 400 U.S. 1024, 91 S.Ct. 581, 27 L.Ed.2d 637 (1971), involved trade secret misappropriation through aerial photography of the construction of a chemical plant. In condemning this action and explicitly finding misappropriation of trade secrets through improper means, this court noted that industrial espionage of this type "has become a popular sport in some segments of our industrial community. However, our devotion to free wheeling industrial competition must not force us into accepting the law of the jungle as the standard of morality expected in our commercial relations." *Id.* at 1016. We find that there is evidence to support the finding that appellants acquired the confidential information through improper means.

The facts before us indicate that Collins induced Phillips to reveal information by assuring him that accumulating the purchase price would be easy because providing collateral for a business loan would present no obstacle. Arnold testified that he owned a home, a business known as Arnold's Service Center which is a metal fabricating facility, and a 40 acre farm in Wisner, Louisiana. Frey testified that he owns farm land in both Mississippi and Louisiana. Frey also stated that they never made any effort to borrow money or even apply for a loan. In the face of such evidence, it does not amount to a miscarriage of justice for the jury to believe that the defendants improperly discovered the trade secret and breached their confidential relationship.

Appellants' next claim is that Phillips should not recover since he completely disregarded all prohibitions that would afford his legal protection on any trade secrets by voluntarily disclosing the manufacturing process through the videotape and the on-cite tours. At no time did Phillips inform the appellants that the information was secret or in any way place them under a duty not to disclose.

It was this court that stated that it is not improper to obtain knowledge of a process where the holder of the alleged trade secret voluntarily discloses it or fails to take reasonable precautions to ensure its secrecy. *E.I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1015 (5th Cir.1970), *cert. denied*, 400 U.S. 1024, 91 S.Ct. 581, 27 L.Ed.2d 637 (1971). *See Interox America v. PPG Industries, Inc.*, 736 F.2d 194, 202 (5th Cir.1984) (one who voluntarily discloses information or fails to take reasonable precautions to insure its secrecy cannot claim that the information constituted a trade secret); *Furr's Inc. v. United Specialty Advertising Co.*, 385 S.W.2d 456, 459 (Tex.Civ.App.—El Paso 1964, writ ref'd n.r.e.), *cert. denied*, 382 U.S. 824, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965) (owner of a trade secret must do something to protect himself or the secret will be lost by its disclosure). However, an owner of a trade secret will not lose the secret by disclosure if he creates a duty in some manner and places that duty upon another not to disclose or use the secret. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 474, 94 S.Ct. 1879, 1882–83, 40 L.Ed.2d 315 (1974) (holding necessary element of secrecy with respect to trade secret not lost if holder reveals it to another in confidence and under implied obligation not to use or disclose it); *Rimes v. Club Corp. of America*, 542 S.W.2d 909, 913 (Tex.Civ.App.—Dallas 1976, writ ref'd n.r.e.). Therefore, while it is true that outside any confi-

dential relationship, one who voluntarily discloses secret information or who fails to take reasonable precautions to secure its secrecy cannot properly claim that information constitutes a trade secret, *see Interox v. PPG Industries, Inc.,* 736 F.2d 194, 202 (5th Cir. 1984), creating such a duty upon the disclosee is a reasonable precaution, and a voluntary disclosure made within the periphery of a confidential relationship eliminates the need to take further precautions to secure the trade secret. *See Sheets v. Yamaha Motors Corp., U.S.A.,* 849 F.2d 179, 183 (5th Cir.1988) (asserting that disclosure of trade secret to one who has no obligation of confidentiality extinguishes property right in trade secret).

The record does contain evidence that Phillips did take steps to protect his secret by not disclosing the process to anyone until the sales negotiations commenced. By this precaution, Phillips disclosed within a confidence that placed the appellants under a duty to keep the secret.

However, appellants deny that there was ever any confidential relationship established that would prevent them from using the information given to them. Appellants assert that the fact that a sale of Ambusher was contemplated does not create a per se confidential relationship between the parties.

They cite to a 1st circuit case which holds that although a confidential relationship will typically be implied if the disclosure was made in a business relationship between a purchaser and supplier, the implied confidential relationship may be defeated if the disclosing party voluntarily conveys a trade secret to another without limitation upon its use. *Burten v. Milton Bradley Co.,* 763 F.2d 461, 463 (1st Cir.1985). Appellants find similarity in the instant case, where Phillips took no steps to protect himself and never indicated that he was giving confidential information to Collins or appellants.

In *Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, *cert. denied,* 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 148 (1958), the Supreme Court of Texas held that an express agreement was not necessary where the actions of the parties and the nature of their relationship, taken as a whole, established the existence of a confidential relationship.

The chief example of a confidential relationship under this rule is the relationship of a principal and agent (See Restatement of Agency, Section 395 and 396). Such is also the relationship between partners or other joint adventurers. But this confidence may exist also in other situations. For example, A has a trade secret which he wishes to sell with or without his business. B is a prospective purchaser. In the course of negotiations, A discloses the secret to B solely for the purpose of enabling him to appraise its value.... In [that] case B is under a duty not to disclose the secret or use it adversely to A. *Hyde,* 314 S.W.2d at 769; *Mercer,* 570 F.2d at 1238. The injured party is not required to rely on an express agreement to hold the trade secret in confidence, nor is he to be denied relief where the offending party originally entered into the relationship without an improper motive. *Id.* at 770.

In *Smith v. Snap–On Tools Corp.,* 833 F.2d 578, 581 (5th Cir.1988), Basil Smith invented a ratchet by combining parts of two existing tools and submitted a tool suggestion form to Snap–On Tools' corporate headquarters. A short time later, Snap–On began manufacturing and selling the ratchet without paying any proceeds to Smith who brought a diversity action claiming trade secret misappropriation. *Id.* at 579. The district court found that Snap–On had misappropriated the trade secret. This court then reversed, holding that the record reflected that there was no confidential relationship existing at the time of disclosure between Smith and the corporation since Smith never explicitly requested that his disclosure be held in confidence, he had submitted the trade secret on his own initiative without any solicitation from Snap–On Tools, and disclosure was not intended as part of the business negotiations. *Id.* at 580. We cited to the Restatement of Torts § 757(b) (1939) which states, "[o]ne who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if ... his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to

him." The proprietor of a trade secret may not unilaterally create a confidential relationship without the knowledge or consent of the party to whom he discloses the secret. *Snap–On Tools,* 833 F.2d at 579–80 (citing Restatement of Torts, comment j (1939)). However, no particular form of notice is needed; the question raised is whether the recipient of the information knew or should have known that the information was a trade secret and the disclosure was made in confidence. *Id.* at 580 (citing Restatement of Torts § 757 comment j (1939)).

██ The case before us is strikingly distinguishable. Even in *Snap–On* we implied that a manufacturer who has actively solicited disclosure from an inventor, and then used the disclosed material, would be liable for misappropriation of trade secrets even where the disclosure was made in the absence of any expressed understanding about confidentiality. *Id.* at 580. Although Phillips never explicitly requested that the secret of his manufacturing process, which gave him a competitive advantage over competitors, be held in confidence, both parties mutually came to the negotiation table, and the disclosure was made within the course of negotiations for the sale of a business. The jury could validly accept such evidence that the defendants knew or should have known that the information was a trade secret and the disclosure was made in confidence.

## CONCLUSION

Although the appellants' evidentiary attacks are couched in terms of "no evidence," they all appear to be nothing more than a sufficiency of the evidence assault. As previously mentioned, this vein of argument is waived by appellants since their trial counsel failed to move for a directed verdict at the close of the evidence.

██ The essence of this action is not infringement, but breach of faith, for it is clear that the plaintiffs could not assert a property right against one who would acquire the secret of their manufacturing process through reverse engineering of the plaintiffs' publicly marketed product, a study of the expired Thomas patent, or any variety of permissible means including the limited ac-

cess to a company's trade secrets obtained during the evaluation of a potential purchase. As Judge King points out in *Omnitech Intern., Inc. v. Clorox Co.,* 11 F.3d 1316, 1325 (5th Cir.1994),

> [t]o hold otherwise would lead to one of two unacceptable results: (i) every time a company entered into preliminary negotiations for a possible purchase of another company's assets in which the acquiring company was given limited access to the target's trade secrets, the acquiring party would effectively be precluded from evaluating other potential targets; or (ii) the acquiring company would, as a practical matter, be forced to make a purchase decision without the benefit of examination of the target company's most important assets—its trade secrets.

The fact is that they did not. Instead, the jury found, they gained it from the plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment. This duty they have breached. *See Thermotics, Inc. v. Bat–Jac Tool Co., Inc.,* 541 S.W.2d 255, 260–61 (Tex.Civ. App.—Houston [1st Dist.] 1976, no writ). There was ample evidence available for the jury to conclude appellants were not sincere in their decision to buy the business, and procured the manufacturing process under the guise of purchasing the business. *See Omnitech,* 11 F.3d at 1325. Moreover, the record supports the conclusion that the appellants acquired the manufacturing process through improper means.

None of the appellants' arguments convince us that plain error exists that would require reversal. *See United States v. Jacquillon,* 469 F.2d 380, 386 (5th Cir.1972) (application of the plain-error rule "is limited to exceptional situations involving serious deficiencies which affect the fairness, integrity, or public reputation of the judicial proceedings"), *cert. denied,* 410 U.S. 938, 93 S.Ct. 1400, 35 L.Ed.2d 604 (1973). We therefore conclude that the jury's verdict does not constitute a manifest miscarriage of justice.

AFFIRMED.