James M. WELSH and Welsh Rock, Incorporated, Plaintiffs,

v.

ROCKMASTER EQUIPMENT MANUFACTURING INC., Scott Hydraulics, Inc., Ray Jackson, Paul J. Scott, Spencer & Frank and Jay M. Cantor, Defendants.

No. Civ.A. 1:96–CV–142.

United States District Court,
E.D. Texas,
Beaumont Division.

March 31, 1998.

J. Hoke Peacock II, Orgain, Bell & Tucker, Beaumont, TX, for James M. Welsh, Welsh Rock, Inc.

Curtis W. Fenley, Jr., Fenley & Bate, Lufkin, TX, for Rockmaster, Scott, Jackson.

Iris Hefter Robinson, Magenheim, Bateman, Robinson, Wrotenbery & Helfand, Houston, TX, for Spencer & Frank, Cantor.

## MEMORANDUM OPINION[1]

COBB, District Judge.

Before this court is Plaintiffs' Application for a Preliminary Injunction on the issue of the validity of the United States Patent Number 5,471,139 (the '139 Patent) now owned by Defendant Rockmaster Equipment Manufacturing, Inc. The '139 Patent was issued on December 26, 1995, and based upon the application of Defendant Paul J. Scott, which was filed on May 25, 1993. Plaintiffs contend that the '139 Patent is invalid and unenforceable, and seek to enjoin Defendants from making, using, or selling the invention disclosed in the '139 Patent.

Specifically, Plaintiffs ask that this court declare the patent invalid. Plaintiffs also ask that Defendants be enjoined from manufacturing, using, selling and/or offering for sale the component and the system until the case is resolved. (The terms "component" and

---

1. This memorandum includes this court's findings of fact and conclusions of law, although not denominated as such by separately numbered paragraphs.

"system" as they relate to this case will be defined in the factual background section of this memorandum). Plaintiffs further ask that Defendants be enjoined from attempting to enforce the patent. Finally, Plaintiffs argue that Defendants should be enjoined during the pendency of this action from reproducing, using, selling and/or distributing any unauthorized copies of Plaintiffs' manufacturing drawings, and from using the trademark "Rockmaster".

This court must determine the following contested issues[2], both as to the facts and the applicable law: 1) whether the "on sale" or "public use" bars apply to this case and invalidate the patent and 2) if the patent is invalid, whether a preliminary injunction is appropriate to prevent Defendants from further benefitting from their misappropriation of a trade secret and from revealing the trade secret to the public at large.[3]

## I. FINDINGS OF FACT

The preliminary injunction hearing was held over a three day period during which the court heard evidence pertaining to the validity of the '139 Patent. The court was very impressed with Mr. Jimmy Welsh's business acumen and as well as his overall knowledge in the mechanical field, in light of his very limited education. The court found Mr. Welsh to be forthright and honest and his testimony to be very credible. Based on the evidence presented, the court finds the following facts.

Plaintiff James M. Welsh is the owner of Plaintiff Welsh Rock, Incorporated. Plaintiffs are in the business of mining glauconite rock. Glauconite is a rock found in Sabine County, Texas, and is used for making secondary roads and as a base for primary roads. Initially, Plaintiffs had drilled holes and blasted the glauconite out of the pits, which proved to be an inefficient method of mining the quantities that Plaintiffs wanted and needed to produce to be competitive. Consequently, Plaintiffs began looking at alternative means to increase mining production.

In approximately December 1989, Plaintiff Jimmy Welsh contacted Ray Jackson at Scott Hydraulics, Incorporated, in Shreveport, Louisiana, regarding a need for a more efficient means of producing a greater tonnage of rock than had been produced before. The business of Scott Hydraulics consisted of the manufacture, repair and design of hydraulic equipment and other machinery. In fact, Scott Hydraulics had previously repaired hydraulic systems on Welsh's other machinery.

To assist Plaintiffs, Ray Jackson, president of Scott Hydraulics, sought a machine that could mine the glauconite, rather than incur the expense of designing and manufacturing a completely new machine. Jackson found a used Japanese machine, called the Mitsuimiike (also known as the Twin–Header). Jackson was paid a consulting fee by Plaintiffs for locating the Twin Header and Scott Hydraulics was paid a commission for the sale of the Twin Header. After repeated attempts to use this machine for mining glauconite, however, Plaintiffs realized that the Twin Header did not meet their needs.

Plaintiffs again contacted Scott Hydraulics to find a viable alternative to mining glauconite. Plaintiff Jimmy Welsh testified that he had "invented" in his mind a machine that would better serve Plaintiffs' needs. Welsh claims that he envisioned a component for use in a system for crushing a wall of rock, comprising of a rotating drum with rows of teeth on the surface (hereinafter Component), which was secured, but removable to an articulating boom on a track hoe machine (the Component, the boom and the hoe are hereinafter collectively referred to as the "System"). Plaintiffs hired Scott Hydraulics to manufacture the Component for Plaintiffs' exclusive use of the System.

---

**2.** Other issues that are before the court will not be decided at this time, including the issues of fraud on the patent office and the duty of a patent attorney to make full disclosure in a patent application.

**3.** If Plaintiffs can not offer sufficient evidence for this court to find the patent invalid, then the patent is presumed valid and Defendants enjoy every right of a patent holder. This court would not have power to enjoin Defendants from exercising their rights under a valid patent.

Plaintiffs, Scott Hydraulics, and Jackson entered into an agreement pursuant to which Scott Hydraulics would provide time, material, and labor toward the manufacture of the Component. Plaintiffs, in turn, would provide all financing for the device. Plaintiffs credibly contend that Scott Hydraulics expressly acknowledged that Plaintiffs owned all rights and title in and to any intellectual property relating to the Component and the System, including the rights to a patent and copyright.

Based on rudimentary drawings or schematics from Welsh, Defendant Paul Scott developed the "Rockmaster" drawings and Scott Hydraulics began manufacture of the first machine. (Paul Scott and Scott Hydraulics are hereinafter referred to as the Scott Defendants). Scott invoiced Welsh for the engineering and drafting of the Component. The first machine was built in the winter of 1991. This machine was tested in the early spring of 1991 in Plaintiffs' quarry located in Sabine County, Texas. It was referred to as the "Welsh Rockmaster", and was so marked with a placard on the machine. Welsh found that machine to be inadequate for his needs. As a result, during the spring of 1991, the Scott defendants made three modifications to the initial machine and a revised component was delivered to Plaintiffs on May 16, 1991. It was fully paid for by Welsh.

Through the summer of 1991, at Plaintiffs' rock quarry, the machine repeatedly broke down from various problems. Upon Welsh's request, Scott Hydraulics determined how to eliminate the problems and repaired and modified the Rockmaster. Each time repairs or changes were made, Welsh was charged and paid for the repairs and changes.

All work done by Scott was accompanied with an invoice, which contained this language on the reverse:

> All goods sold hereunder are warranted to be free from defects in material and workmanship. These express warranties are in lieu of and exclude all other warranties, expressed or implied. Seller's sole obligation under these warranties shall be to issue credit, repair or replace any item or part thereof which is proved to be other than as warranted. Seller shall have the sole right to determine whether such parts shall be repaired or replaced or whether credit shall be issued. No allowance shall be made for any labor charges of Buyer for replacement of parts, adjustments or repairs, or any other work unless advance written authorization for such charges is given by Seller. In no event shall Seller be liable for collateral or consequential damages. If goods are claimed to be other than as warranted, Seller, upon notice promptly given, will either examine the goods at their site or issue shipping instructions for return to Seller (transportation costs repaid by Buyer), and if any goods are proven to be other than is warranted, transportation costs (cheapest way) to and from Seller's plant will be borne by Seller and reimbursement or credit will be made for amounts so expended by Buyer. Every such claim for breach of the warranties herein contained shall be deemed to be waived by the Buyer unless made in writing within 30 days from the date of shipment of the goods to which such claim relates....

The Scott Defendants continued working with Plaintiffs over the course of the next few months in repairing and altering the design of the two old machines. Additionally, in May 1992, Jimmy Welsh was invoiced for a third "New Rockmaster", model "RM–3", at a cost of $65,000.

Other than to request needed repairs or alterations, Welsh never reported on the progress to the Scott defendants nor produced any progress reports. According to Scott Hydraulics' invoices, Scott Defendants tested each machine before delivering them to Welsh. No further testing to confirm that the machine was fit for the purpose it was built, however, was performed by Scott after each machine was delivered to Welsh. Nor did the Scott Defendants ever request that certain tests be performed by Plaintiffs or that Plaintiffs limit the use of the Component in any way. Finally, Plaintiffs never entered into a secrecy agreement with the Scott Defendants requiring that the testing be done privately or secretly.

Defendants started marketing and offering for sale the Rockmaster to various people around the country. In one letter on Scott Hydraulics letterhead dated December 30, 1991, the Defendants wrote, "We now have two units in operation, know we have obtained the quality demanded by Paul and we are now developing our marketing strategy." In a second letter dated March 27, 1992, also appearing on Scott letterhead, Ray Jackson, the president of Scott, wrote, "I have developed the following Lease/Purchase program for our Rockmaster, Glaucinite (sic) mining machine." In other undated letters, the Scott Defendants referred to the Rockmaster as the "Welsh Rockmaster" and assured the recipient of the letter that the machine had been in "performing for 18 months with minor repairs."

In December of 1992, Rockmaster Equipment Manufacturing, Incorporated (hereinafter "REM") was created to exploit the potential of the Component. Defendants Scott and Jackson and Plaintiff Welsh were the sole stockholders of REM. A patent application was filed through Defendant Jay Cantor, an attorney, on May 25, 1993. Scott was listed as the sole inventor of the machine. The patent, United States Patent No. 5,478,-139, entitled "Mobile Digging/Cutting System," was issued to REM on December 26, 1995 by the United States Commissioner of Patents and Trademarks.

Plaintiffs credibly claim that Defendants fraudulently identified Scott as the sole inventor and that the patent was procured through other fraudulent omissions and misrepresentations. After the issue of the patent, Plaintiffs entered into negotiations with Marine Pipe and Copperworks for the manufacture of the Component. The Scott Defendants threatened to sue Marine Pipe for patent infringement if it manufactured any Components for Plaintiffs. As a result Marine Pipe has refused to negotiate further with Plaintiffs. In the meantime, Defendants continued to produce the Component for sale to others, including competitors to Welsh.

Based on allegations of misappropriation of trade secrets, patent misuse, and unfair competition, Plaintiffs filed suit to have the '139 Patent declared invalid and unenforceable. Plaintiffs further sought to enjoin Defendants from producing, selling, or using the invention disclosed in the '139 Patent. Finally, Plaintiffs seek to enjoin Defendants from wrongfully enforcing the patent. Plaintiffs allege that, unless the injunction is entered, Defendants will continue to interfere with Plaintiffs' business opportunities, profit of its wrongful behavior, and destroy Plaintiffs' competitive advantage in the industry.

## II. THE APPLICABLE LAW

### A. The Validity of the Patent

A patent is presumed valid. 35 U.S.C. § 282 (1984 and Supp.1996). Thus, the burden of establishing invalidity rests on the party asserting such invalidity to prove by clear and convincing evidence that the patent is invalid. *Seal–Flex, Inc. v. Athletic Track & Court Constr.*, 98 F.3d 1318, 1324 (Fed.Cir.1996); *DeGeorge v. Bernier*, 768 F.2d 1318, 1321 (Fed.Cir.1985). The party asserting patent invalidity must bear the burden throughout the litigation. *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, 796 F.2d 443, 446 (Fed.Cir.1986), *cert. denied*, 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987); *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1197 n. 4 (Fed.Cir.1994), *cert. denied*, 514 U.S. 1015, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995). As a result, Plaintiffs have the burden of proving by clear and convincing evidence that Patent '139 is invalid.

### 1. Application of 35 U.S.C. § 102(b)

Plaintiffs argue that the patent is invalid because of the "on sale bar" or the "public use" doctrine. The applicable statute, 35 U.S.C. § 102, states:

A person shall be entitled to a patent unless—

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

In the present case, the patent application was filed on May 25, 1993. Thus, the critical time and controlling question is whether the

invention was "on sale" or in "public use" in this country before May 25, 1992.

### 2. On Sale Bar Argument

#### a. Scope of the Patent

■ In order to establish an on sale bar, the offered product must be shown to be the claimed invention, and this may be established by any relevant evidence, including memoranda, drawings, correspondence, and testimony of witnesses. *RCA Corp.*, 887 F.2d at 1060. Defendants state that the product allegedly sold did not embody the claims of the '139 Patent since the invention disclosed in the '139 Patent is a system for crushing a wall of rock comprising (a) a track hoe; (b) an articulating boom; and (c) a separate rotating rock cutter. Defendants argue that the invention embodied in the patent is a system containing three separate components.

Plaintiffs do not disagree that the components must work together as a system to achieve the desired result of mining glauconite in a commercially useful way. Plaintiffs, however, contend that the patent at issue in this case clearly did not contemplate for the invention to include a track hoe and boom already owned or acquired by the purchaser of the Rockmaster from another party, since the patent states that the cutter head should be suitable for use on any "well known" "standard" track hoe.

Both parties have proven the track hoe and the articulating boom were on sale before 1989. At that time, Welsh asked Ray Jackson of Scott Hydraulics to help him find and purchase a Mitsuimiike for use in his glauconite mine. Jackson was paid a consulting fee, and after locating one, Scott Hydraulics bought it, and then sold it and delivered it to Welsh. A track hoe and articulating boom nearly identical to the one used with the Rockmaster made up part of the Mitsuimiike machine. Additionally, all the invoices sent to Welsh by the Scott Defendants listed the invention only as "the digger head". They never include a track hoe or articulating boom as part of the requested machine nor did they ever provide them as part of the machine. Finally, the patent contemplated that any number of track hoes could be used with the digger head.

The track hoe and articulating boom used with the cutter head were not in any way new or attributable to the Scott Defendants. The helical rotating head to be installed upon the existing track hoe and boom is the only device that is in any manner a new "invention". Therefore, the patent could not have contemplated anything other than the Rockmaster "digger head" as the embodiment of the thing for sale.

#### b. Application of the "On Sale" Bar Doctrine

■ Plaintiffs contend that every claim of the '139 Patent is invalid because a device incorporating the invention disclosed in the '139 Patent was sold by Defendants to Plaintiffs prior to May 25, 1992. The issue of whether an invention is subject to the on sale bar is a question of law. *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1186 (Fed.Cir.1993). Plaintiffs have the "burden of proving that there was a definite sale or offer to sell more than one year before the application for the subject patent and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art." *RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056, 1059 (Fed.Cir.1989), citing *UMC Elecs. Co. v. United States*, 816 F.2d 647, 656 (Fed.Cir.1987), *cert. denied*, 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988) (citations omitted).

■ To determine whether there was a sale or offer of sale, the court must consider the totality of the circumstances surrounding the offer of sale. *See In re Brigance*, 792 F.2d 1103, 1107–08 (Fed.Cir.1986). "A determination that an invention was on sale within the meaning of section 102(b) requires that 'the claimed invention asserted to be on sale was operable, the complete invention claimed was embodied in or obvious in view of the device offered for sale, and the sale or offer was primarily for profit rather than for experimental purposes.'" *KeyStone Retaining Wall Systems, Inc. v. Westrock, Inc.*, 997

F.2d 1444, 1451 (Fed.Cir.1993). Therefore, Plaintiffs, with the burden of proving the patent invalid, must show that the sales can not be characterized as experimental use. Defendants do not deny that the Rockmaster was sold or "on sale", in the common usage of the term, prior to the critical date, but emphatically assert that their dealings with Plaintiffs were solely for the purpose of experimenting with and perfecting the Rockmaster component.

■ To determine whether a use is experimental, a question of law, the totality of circumstances must be considered, including various objective indicia of experimentation surrounding the use. *Lough v. Brunswick Corp.*, 86 F.3d 1113, 1120 (Fed.Cir.1996). Such objective indicia include the number of prototypes and duration of testing, whether records of progress reports were made concerning the testing, existence of a secrecy agreement between the patentee and the party performing the testing, whether the patentee received compensation for the use of the invention, and the extent of the control the inventor maintains over the testing. *Id.*

■ Defendants contend that because the machines were constantly changing through various repairs and modifications, the sale the machine should be characterized as experimental use. Plaintiffs contend that, throughout the period from 1991 to 1993, the cutter head was utilized for the purpose of mining glauconite and not for the purpose of perfecting the invention. There were several changes and modifications made and different rotating drums developed to overcome problems discovered by Welsh in the use at his mining quarry. Welsh needed a machine which would be commercially useful for the purposes of producing glauconite in sufficient quantity and consistency. In order to accomplish these goals, the product would have to be durable enough and capable of operating close to twenty-four hours a day on a daily basis. As the machine developed various problems, it would be returned to Scott

Hydraulics for repairs or modifications, and the mining would start once again.

Each repair, change, or modification was invoiced to Welsh, who paid Scott in full for the repairs and changes. The reverse of each invoice contained the language noted above which clearly established a seller/purchaser relationship between Scott and Welsh. The invoices did not purport to give Scott any right to test the machinery, nor did they absolve Scott from responsibility for defects as part of the natural process of experimentation of a new invention. No one at Scott Hydraulics ever initiated any changes, improvements, or new designs. All such actions were suggested by Welsh.

No formal reports were made as to experimentation and progress reports from Plaintiffs to Defendants were at best infrequent, if not all together non-existent. There are no documents nor testimony reflecting that Welsh had any obligation to report anything about any of the three Rockmaster cutter/digger heads that were sold to him in before May 25, 1992, to either Scott Hydraulics, or Paul Scott, individually.

Plaintiffs and Defendants did not enter into a secrecy agreement, written or oral. Plaintiffs were not in any way restricted in how they used or tested the machine. To the contrary, Plaintiffs allowed some non-parties on the quarry premises while the Rockmasters were being used. Defendants filmed the machine in use and sent copies of the film to potential buyers before the critical date. Therefore, it is clear that neither party contemplated their relationship to include a secrecy agreement.

Plaintiffs paid for the machines, indicating that at least three sales were made before May 25, 1992. In fact, Scott Hydraulics' invoices for the machines and all the service performed were captioned, "SOLD TO Jimmy Welsh" or labeled the transaction a "lease/purchase". On the second and third machine, Scott Hydraulics made a profit of nearly $20,000 per machine over and above the actual cost of producing the machine.[4]

---

4. *But see Environmental Instruments, Inc. v. Sutron Co.*, 688 F.Supp. 206, 215 (E.D.Va.1988) (noting that exception for transfers of machinery for experimental purposes can involve the trans-

fer of funds without constituting a sale as defined by the on sale bar); *In re Yarn Processing Patent Validity Litigation*, 498 F.2d 271, 277 (5th Cir.), *cert. denied*, 419 U.S. 1057, 95 S.Ct. 640, 42

Lastly, Scott retained absolutely no control over the machines after they were returned to Welsh. Control is a heavily weighted factor and deserves extra attention. *See Lough, supra,* at 1120. There are no documents reflecting that there were any restrictions on Plaintiffs' use of the three Rockmaster cutter/digger heads sold to them by Scott Hydraulics. Furthermore, Mr. Scott admitted that all uses of the machine were maintained under the control of Plaintiffs. This admission was made in Defendants' Response to Plaintiffs' Motion for Summary Judgment where Defendants stated that "[n]o one else [other than Plaintiffs] utilized the machine and all uses were maintained in the control of Plaintiffs (sic) property." Additionally, there is no evidence that any repairs were made at Scott's request. In fact, Scott testified that neither he nor anyone at Scott Hydraulics retained any control over the three machines sold to Welsh before May 25, 1992. As the Federal Circuit stated in *Lough,* "[I]f the inventor has no control over the alleged experiments, he is not experimenting. If he does not inquire about the testing or receive reports concerning the results, similarly, he is not experimenting." 86 F.3d at 1120.

Defendants point out that the Federal Circuit has stated, "[t]he general rule is that the on sale bar starts to accrue when a completed invention is offered for sale." *Seal–Flex,* 98 F.3d at 1324, citing *Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1563 (Fed. Cir.1987). In other words, Defendants argue that because the invention was neither complete nor known to work for its intended purpose when Plaintiffs were using the Rockmaster machines, the use must be characterized as experimental use and any on sale bar contentions must be dismissed. *See UMC Elecs.,* 816 F.2d at 657.

The Scott Defendants offered Rockmasters for sale to numerous third parties with the assurance that the first two machines were "performing for 18 months with minor re-

pairs" and in "operation" and had "obtained the quality demanded by Paul". At the very bare minimum, the third Rockmaster machine, sold to Welsh on May 3, 1992, must be considered complete and known to work for its intended use. It was the final version offered for sale to other buyers and there is no evidence that any further modifications were made to insure that the machine was operable for its intended purpose. Furthermore, there is no evidence that the purpose of the transfer of the third machine from Scott to Welsh was for any reason other than for Scott to make a sizable profit[5] and for Welsh to have an extra and improved component. Over the course of first three years of their relationship until the critical date, the Scott Defendants did not make any effort to insure that the machines were operable to serve their intended purposes, other than to make repairs and changes requested and paid for by Welsh.

Based on these findings of fact, this court concludes that the Rockmaster was operable for its intended function prior to the critical date. It further concludes that the claimed invention was embodied in the Rockmaster digger head. Finally, it finds that the primary purpose for the sales and offers to sell the Rockmaster was for profit and not for experimentation. Therefore, this court concludes that the "on sale" bar applies to this case. *See Kolmes v. World Fibers Corp.,* 107 F.3d 1534, 1540 (Fed.Cir.1997).

### 3. Public Use Argument

Plaintiffs also argue that the patent violates § 102(b) because it was in the public domain more than one year prior to the date the patent application was filed. Public use has been defined as any use of that invention by a person other than the inventor who is under no limitation, restriction, or obligation of secrecy to the inventor. *Grain Processing Corp. v. American–Maize Prods. Co.,* 840

---

L.Ed.2d 654 (1974) (holding that if the use of an invention is primarily for experimental purposes, the fact that profits are made will not bar the patentability of the invention).

**5.** Scott Hydraulics built the first machine at a cost of $47,190. Scott charged Welsh $65,000 for the third model, the same price for which it was offered to outside buyers. Scott was clearly motivated by profit and showed no interest in the testing of the machines.

F.2d 902, 906 (Fed.Cir.1988), citing *In re Smith,* 714 F.2d 1127, 1134 (Fed.Cir.1983).

 In the present case, one of the Defendants, Mr. Scott, was named as the inventor of the patent. Defendants admitted in testimony that once the cutter heads were turned over to Welsh, they had no control over the components and never placed any restrictions or limitations on his use of the machines. There is no evidence that Welsh had any duty to report back to the Scott Defendants or to use the machine in a limited or restricted way. Welsh used the cutter heads in his quarry to mine glauconite free and clear of any restrictions. Furthermore, there was no secrecy agreement between any of the parties, written or oral. In fact, the use of the machine was somewhat open to public view. While Welsh admitted to not allowing competitors to inure to the benefit of observing his brainchild at work, Welsh did suggest that third parties actually saw the machine at work in his quarry before the critical date of May 25, 1992. Defendants even sent copies of a videotape of the machine at work to potential buyers prior to the critical date.

It is clear that Welsh's use of the Rockmaster in his quarry qualifies as public use under the definition given by the Federal Circuit in *Grain Processing, supra.* The Federal Circuit, however, also has stated, "If a use is experimental, it is not, as a matter of law, a public use within the meaning of section 102." *Lough, supra,* at 1120. The test for experimental use in "public use" cases is identical to the one used in "on sale" bar cases. Defendants contend that the alleged public use was for experimentation.

In light of this court's findings and conclusions in section II.B.2 of this Memorandum, Defendants' argument is not persuasive. No secrecy agreement existed; no records or progress reports of made concerning the experimentation; Paul Scott, the patentee and named inventor, richly profited from the sale; and Scott retained no control over the machine after the sale. Based on these findings of fact, this court concludes the Rockmaster machine was in public use prior to the critical date of May 25, 1992.

### 4. Patent is Invalid

Based on the foregoing finds of fact and conclusions of law, this court holds that the "on sale" bar and the "public use" bar apply to the '139 Patent. Therefore, the patent is declared invalid.

### B. APPROPRIATENESS OF A PRELIMINARY INJUNCTION

 Plaintiffs seek to enjoin Defendants from (1) offering for sale, selling, manufacturing, using, renting, marketing, advertising, promoting, and distributing any Component or System; (2) attempting to enforce the fraudulently procured patent, which has now been declared invalid; (3) reproducing, using, selling, and/or distributing copies of "Plaintiffs' copyrighted manufacturing drawings" without Plaintiffs' express authorization; and (4) using the trademark "Rockmaster" in any way.

A preliminary injunction is an extraordinary remedy which should not be granted if there is an adequate remedy at law. *DSC Communications v. Next Level Communications,* 107 F.3d 322, 328 (5th Cir.1997). For this court to enter an order enjoining Defendants, Plaintiffs must clearly establish (1) a substantial likelihood of success on the merits of their claims; (2) that they will suffer irreparable injury absent the injunction; (3) the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) that granting the injunction is not adverse to the public interest. *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.,* 878 F.2d 806, 809 (5th Cir.1989).

### 1. Plaintiffs Have a Substantial Likelihood of Success on the Merits

 Having heard all the witnesses and observed their demeanor and candor (or lack thereof) during the injunction hearing, and based on the evidence presented and the court's assessment of credibility, this court finds that Plaintiffs have a substantial likelihood to succeed on the merits of the case. Under Texas law, trade secret misappropriation is established by showing: (a) a trade secret existed; (b) the trade secret was acquired through a breach of a confidential

relationship or discovered by improper means; and (c) use of the trade secret without authorization from the plaintiff. *Phillips v. Frey*, 20 F.3d 623, 627 (5th Cir.1994). A trade secret is any formula, pattern, device, or compilation of information used in business, which gives the owner an opportunity to obtain an advantage over his competitors who do not know or use the secret. *Id.* at 628.

There is credible evidence that Welsh owned all rights to the design of the Rockmaster, which gave him a competitive advantage over his competitors. There is evidence that the Scott Defendants breached their confidential relationship with Welsh to acquire the design. Evidence suggests that, when Welsh revealed his ideas to Scott, he did so with the understanding that he would retain all the rights to the trade secret and that Scott would not use it without Welsh's authorization. Finally, there is evidence that the Scott Defendants used the trade secret in securing a patent without Welsh's prior authorization. Therefore, this court concludes that there is a substantial likelihood that Welsh would prevail on the merits.

### 2. Plaintiffs Will Suffer Irreparable Injury Absent the Injunction

Plaintiffs will suffer irreparable injury if the injunction is not entered. Irreparable injury is a "potential harm which cannot be redressed by legal or equitable remedy following trial." *Campbell Soup Co. v. ConAgra Inc.*, 977 F.2d 86, 91 (3rd Cir.1992). If Defendants are not enjoined from revealing the trade secret to the public at large or any of Welsh's competitors, Plaintiffs will lose a competitive advantage in the industry. "Once the proverbial bell has been rung, its sound can neither be recalled nor subsequently silenced." *State ex Rel. Faith Hospital v. Enright*, 706 S.W.2d 852, 855 (Mo. 1986) (J. Robertson). Plaintiffs' competitors will have access to the machine through Scott, while Plaintiffs will be constrained by the patent from acquiring a new machine from a different source. Unless enjoined, Defendants will continue to interfere with Plaintiffs' business opportunities by threatening patent infringement suits. These losses

in competitive advantage could not be quantified nor adequately remedied at law.

### 3. The Threatened Injury Outweighs Any Damage That the Injunction May Cause the Opposing Party

The threatened long-term loss to Plaintiffs greatly outweighs the potential temporary damage to Defendants that may result from the imposition of an injunction. Furthermore, in light of the allegations of fraud and breach of a fiduciary relationship, it behooves this court to protect against the possibility that Defendants will continue to benefit from the allegedly reprehensible behavior that led to this law suit.

### 4. The Granting of the Injunction Is Not Adverse to the Public Interest

Granting the injunction protects the public interest by promoting the well-accepted public policies underlying intellectual property jurisprudence, such as the prompt and widespread disclosure of inventions and allowing the inventor a reasonable amount of time following sales activity to determining the potential economic value of a patent. *See Lough, supra,* at 1119. Furthermore, granting the injunction promotes the general principles of equity and justice.

Based on the foregoing, this court concludes that granting a preliminary injunction is appropriate in this case.

### III. CONCLUSION

Plaintiffs have offered substantial credible evidence that the Rockmaster digger head was "on sale" and in "public use" prior to the critical date of May 25, 1992. Plaintiffs also have substantially rebutted Defendants' contention that the sale and use of the Rockmaster was for experimentation. Accordingly, this court concludes that Plaintiffs have proven by clear and convincing evidence that the '139 Patent is invalid and, thus, declares the patent invalid.

Having declared the patent invalid, this court concludes that Plaintiffs have met the four-pronged test for the issuance of a preliminary injunction. Plaintiffs have a substantial likelihood of success on the merits of the underlying causes of action. Plaintiffs

will suffer irreparable harm, in the form of the loss of a trade secret and a competitive advantage, if Defendants are not enjoined. The threatened harm to Plaintiffs outweighs any potential damage caused to Defendants by the imposition of the injunction. Finally, the injunction furthers the policies of intellectual property jurisprudence and is in the best interest of the public. Based on those findings and conclusions, the following preliminary injunction will be entered:

(1) Defendants shall be enjoined from attempting to enforce the '139 Patent and from interfering with Plaintiffs' business relationships by threatening patent infringement suits;

(2) During the pendency of this suit, Defendants shall be enjoined from offering for sale, selling, manufacturing, using, renting, marketing, advertising, promoting or distributing the Component or the System;

(3) During the pendency of this suit, Defendants shall be enjoined from using the trademark "Rockmaster" in any manner;

(4) During the pendency of this suit, Defendants shall be enjoined from reproducing, using, selling, or distributing copies of the manufacturing drawings, design schematics, scale models, and prototypes, and from disclosing in any manner to anybody any trade secrets regarding the Rockmaster; and

(5) The Plaintiffs must execute a bond as required by law in the amount of $100,000 with a surety approved by the clerk of this court before the preliminary injunction is effective.

It therefore is ORDERED, ADJUDGED, and DECREED that Plaintiffs' Application for a Preliminary Injunction is GRANTED.