ZOECON INDUSTRIES, a DIVISION OF ZOECON CORPORATION, Plaintiff-Appellee,

v.

The AMERICAN STOCKMAN TAG CO., Carolyn Reed and Nelda Poncik, Defendants-Appellants.

No. 82–1463.

United States Court of Appeals, Fifth Circuit.

Sept. 9, 1983.

---

Palmer, Palmer & Coffee, Philip I. Palmer, Jr., Dallas, Tex., for defendants-appellants.

Thompson & Knight, Schuyler B. Marshall, IV, Louise Ellen Teitz, Dallas, Tex., for plaintiff-appellee.

Before WISDOM, TATE and GARWOOD, Circuit Judges.

WISDOM, Circuit Judge:

In this diversity case the issue the appeal raises is whether a memorandum containing the names, addresses, and purchasing characteristics of a business's customers is a trade secret under Texas law. The defendants, Carolyn Reed, Nelda Poncik, and the American Stockman Tag Company, appeal from a judgment permanently enjoining them from (1) using certain stamping equipment identical with that used by Temple Tag Company, (2) disclosing the modifications made to that type of equipment by Temple Tag, and (3) using or disclosing the contents of a customer list obtained from Temple Tag. The court also awarded actual and exemplary damages to the plaintiff, Zoecon Industries. The district court found that Reed and Poncik breached a confidential relationship by misappropriating the trade secrets of their former employer, Temple Tag Company, a Zoecon subsidiary. The district court also found that Reed, assisted by Poncik, breached a non-competition agreement she had entered into with Zoecon by forming American Stockman, a competing business.

On appeal, Reed and Poncik make three contentions. First, they contend that the district court erred in finding that they had breached a confidential relationship because Temple Tag's customer list, the basis for the court's determination that there had been a breach, is not a trade secret under Texas law. Second, Reed contends that the non-competition agreement is invalid and nonenforcible under Texas law because it does not state a reasonable territorial limitation. Finally, Reed and Poncik contend that the evidence presented at trial does not support the court's finding of fact that they used the list to solicit customers for American Stockman.

We hold that the customer list is a trade secret under Texas law. The district court's finding that the defendants used the memorandum in soliciting customers is not clearly erroneous. Reed and Poncik, therefore, breached a confidential relationship with their former employer by using the list in soliciting customers and by disclosing the information contained in it. Because of this holding, it is unnecessary to address the validity of the non-competition agreement under Texas law. We affirm.

I.

Before February 1977, Temple Tag Company was an independent company that manufactured various types of plastic ear tags, including tags used by feedlots to identify cattle. Temple Tag sold these ear tags directly to the cattle feedlots. Reed

was the assistant general manager and a ten percent stockholder of Temple Tag. Temple Tag also employed Poncik.

In February 1977, Zoecon Industries purchased Temple Tag. Reed sold her Temple Tag stock to Zoecon for $270,000. At the time of the sale, she executed a non-competition agreement with Zoecon.[1] Zoecon Industries later merged with Zoecon Corporation, which Hooker Chemical Corporation later acquired.

Reed and Poncik, while employed at Temple Tag, executed employee agreements with Hooker.[2] They agreed not to disclose any information, inventions, or discoveries without the consent of the company. In 1978, Reed became general manager of Temple Tag. One year later, Poncik became assistant general manager. During this time, feeder ear tags were an important and growing part of Temple Tag's business. The company began selling to distributors, rather than directly to cattle feedlots as it had done previously. In the summer of 1979, Reed and Poncik begin planning to form their own company to manufacture feeder ear tags and to sell them directly to ultimate users. American Stockman was formed in August 1979, and Poncik became its president.

Reed and Poncik, however, worked for Temple Tag until late October 1979. Between August 1979 and October 1979, they engaged in various activities at Temple Tag that would benefit American Stockman. They obtained a molding machine and other equipment used to make feeder ear tags. At their request, other Temple Tag employees provided an operating manual for the molding machine and a description of the modifications that Temple Tag made to the equipment it used.[3] Reed directed another Temple Tag employee to prepare a memorandum listing ear tag customers and distributors. This list contained names and addresses, as well as information on the type of ear tag purchased by each customer, the amount purchased, the dates of purchases, and other information about the customers. The district court found that this information, which was not known to the general public, was used by Temple Tag to project future sales and to service its customers.

In early 1980, Reed and Poncik made telephone calls to Temple Tag's feedlot customers soliciting sales of ear tags manufactured by American Stockman. The record showed that 94 percent of American Stockman's sales were made to former customers

---

1. "For and in consideration of the terms, covenants, and conditions contained in the aforementioned Agreement, the undersigned Shareholders agree as follows: 1. From the date hereof, for a period of five (5) calendar years, Shareholders shall refrain from engaging in any business activity . . . which directly or indirectly competes with the business activities of [Temple Tag] . . . as of the date hereof. Such prohibited activities shall specifically include, but are not limited to, the activities of the production, manufacture or sale of livestock identification materials and products. 2. Subsequent to the date hereof, Shareholders shall not disclose or dispose of, in any matter whatsoever, facts or information concerning any formulas, methods, inventories, methods of operation, customer lists or any other matters related to the operations of the Company."

2. The Agreement provides in part:
 2. With respect to any such information, inventions and discoveries . . . and to all other information, whatever its nature and form and whether obtained orally, by observation, from written materials or otherwise, . . . ,

obtained by me during or as a result of my employment . . . relating to any products, apparatus or processes, to any uses thereof or therefor, to raw materials or product prices or costs . . . or to any research, technical, manufacturing or commercial activities or plans of Hooker . . . , I agree:
 a. To hold such information, . . . in *strict confidence,* and not publish or otherwise disclose . . . except to or with the prior consent . . . of the Company.
 . . . .
 c. To make no use of such information, invention or discovery except such use as is required in the performance of my duties for the company.
 . . . .
 6. I agree to perform and carry out diligently, faithfully and to the best of my ability all duties assigned . . . , and to act and comport myself at all times in the best interests of the Company.
 (Emphasis added)

3. The defendants have not appealed the district court's permanent injunction on the use of this equipment.

of Temple Tag. Temple Tag had only seven percent of the feeder ear tag market. From this information, the trial judge inferred that Reed and Poncik used the memorandum of Temple Tag customers to obtain customers for American Stockman. In response to American Stockman's entry into the market, Temple Tag established a promotional program: "Buy 5 Tags, Get 2 Tags Free".

Zoecon Industries sought a preliminary injunction against American Stockman, Reed, and Poncik contending that they were using its trade secrets, infringing its trademark, and violating a non-competition agreement. On August 19, 1980, the district court entered a preliminary injunction, enjoining the continued use of certain machinery not at issue here, the continued use or disclosure of the information contained in the memorandum of Temple Tag's cattle feed tag customers, and Reed's participation in American Stockman's business activities. The district court refused injunctive relief for the use of the list of Temple Tag's suppliers and the list of feedlots showing the location of Temple Tag's hot stamping machines, because these lists were not trade secrets. On June 23, 1982, the district court issued a permanent injunction [4] and awarded damages against the defendants, jointly and severally, in the amount of $457,590.66, against Reed, individually, the sum of $53,705.60, and against Poncik, individually, the sum of $51,834.20. The court also awarded attorney's fees and costs to Zoecon Industries.

### II.

■■ To maintain a cause of action for the disclosure of a trade secret against an employee, the employee must have a duty not to disclose. Our initial inquiry is whether a confidential relationship existed between the employer, Temple Tag, and the employees, Reed and Poncik. A confidential relationship gives rise to an employee's duty not to use or disclose the employer's

trade secrets. *E.I. duPont de Nemours Powder Co. v. Masland,* 1917, 244 U.S. 100, 102, 37 S.Ct. 575, 577, 61 L.Ed. 1016, 1019; *see also Mercer v. C.A. Roberts Co.,* 5 Cir. 1978, 570 F.2d 1232, 1238 (applying Texas law); Comment, *Trade Secrets in Texas— The Employer's Rights in the Absence of Contractual Protection,* 17 S.Tex.L.J. 132, 138 (1975). Not all employment relationships are confidential ones. *Mercer v. C.A. Roberts Co.,* 5 Cir.1978, 570 F.2d 1232, 1238. A confidential employment relationship can be established expressly by contract or can be implied from the nature of the relationship. When an employee has an intimate knowledge of the employer's business, a confidential relationship will be implied. *Id.* In this case, Reed and Poncik were the key management personnel at Temple Tag; they necessarily had an intimate knowledge of the business. They also had signed employee agreements containing non-disclosure provisions.[5] Thus, we find that under either test a confidential relationship existed between the defendants, Reed and Poncik, and Zoecon Industries, the parent corporation of Temple Tag.

■■ When a confidential employment relationship is established, the employer has a qualified right to secrecy that arises from the relationship and is required by principles of good faith. R. Callman, The Law of Unfair Competition, Trademarks, and Monopolies § 14.03 (4th ed. 1982). The employee has a concomitant duty not to use or disclose the employer's trade secrets, if he knows or should have known that the employer desired secrecy. *Mercer v. C.A. Roberts Co.,* 5 Cir.1978, 570 F.2d 1232, 1238. Based upon the facts of this case, there is no doubt that Reed and Poncik knew that Temple Tag intended its customer information to remain secret. Both Reed and Poncik executed employee agreements expressly providing that they were to hold all information obtained from their employment in strict confidence. The evidence

4. On August 16, 1982, the district court modified its judgment to specify that the permanent injunction enjoined the defendants from soliciting or making sales to any party listed on the memorandum of Temple Tag's feeder tag cus-

tomers prepared by Reed and from using or disclosing the contents of the memorandum to any other party.

5. For the text of this agreement, see note 2.

also shows that when questioned about the list Reed denied having it, allowing the factfinder to infer her knowledge that Temple Tag intended this information to remain secret.

■ The duty not to disclose, however, is breached only when the information disclosed can be properly classified as a trade secret.[6] *Mercer v. C.A. Roberts Co.,* 5 Cir. 1978, 570 F.2d 1232, 1238–39 (alternative holding). The Texas Supreme Court, following the Restatement of Torts § 757, comment b (1939), defines a trade secret as "any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be . . . a list of customers." *Hyde Corp. v. Huffines,* 1958, 158 Tex. 566, 314 S.W.2d 763, *cert. denied,* 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 149; *Elcor Chemical Corp. v. Agri-Sul Inc.,* Tex.Civ.App.1973, 494 S.W.2d 204. The memorandum at issue in this case falls within this definition because it is a list of customers. The type of customer information contained in the memorandum also gave Reed and Poncik an advantage over competitors who did not have the information. *See Collins v. Ryon's Saddle & Ranch Supplies, Inc.,* Tex.Civ.App.1979, 576 S.W.2d 914, 915.

■ The Texas courts, however, have added a criterion to the traditional definition: a trade secret must be "secret". Thus, to qualify as a trade secret the information cannot be generally known by others in the same business nor readily ascertainable· by an independent investigation. *Mercer v. C.A. Roberts Co.,* 5 Cir. 1978, 570 F.2d 1232, 1239; *Gaal v. BASF Wyandotte Corp.,* Tex.Civ.App.1976, 533 S.W.2d 152; *Brooks v. American Biomedical Corp.,* Tex.Civ.App.1973, 503 S.W.2d 683. Thus, a customer list of readily ascertainable names and addresses will not be protected as a trade secret.[7] *Gaal v. BASF Wyandotte Corp.,* Tex.Civ.App.1976, 533 S.W.2d 152, 155.

■ Whether customer information is generally known or readily ascertainable is a question of fact.[8] In the instant case, the district court found that the information contained in the memorandum of Temple Tag's feeder ear tag customers was not known or available to the public. The memorandum contained information concerning the type and color of ear tags purchased, the date of purchase, and the amount purchased, in addition to the names and addresses of Temple Tag's customers. Even if the names and addresses were readily ascertainable through trade journals as the defendants allege, the other information could be compiled only at considerable expense. *Cf. SCM Corporation v. Triplett Company,* Tex.Civ.App.1966, 399 S.W.2d 583, 587. Based on the record, we cannot

---

**6.** The subject matter of trade secrets falls into two categories, technological and internal operating information. R. Callman, The Law of Unfair Competition, Trademarks, and Monopolies § 14.06 (4th Ed.1982). Customer lists fall into the latter category.

**7.** At least one Texas appeals court case has suggested that the use of business information obtained by an employee in an unlawful manner from his employer will give rise to liability, though the information is not technically a trade secret. *Jeter v. Associated Rack Corp.,* Tex.Civ.App.1980, 607 S.W.2d 272, 275–76. The *Jeter* court held that the key inquiry is whether the employee obtains access to confidential business information to facilitate the formation of a new corporation without the permission of the employer. The availability of a lawful means to acquire the information is not dispositive of the issue of a breach of confidentiality. *Id.* at 275. *See also* Comment, *Mis-*

*appropriation of Trade Secrets,* 53 Tul.L.Rev. 215, 226–27; R. Callman, The Law of Unfair Competition, Trademarks, and Monopolies § 14.03 at 21. Reed and Poncik acquired the business information at issue here during work hours, with the aid of other employees, and without Temple Tag's knowledge or permission. Because we find that the customer information constituted a trade secret, we do not reach the issue of liability under this theory.

**8.** Because the classification of information as a trade secret depends on the facts of each case, this area of the law is unsettled, resulting in seemingly conflicting opinions. The classification of customers lists is particularly confused. *See Crouch v. Swing Machinery Co.,* Tex.Civ. App.1971, 468 S.W.2d 604 (Cadena, J., stating that "the customer list cases stand on the periphery of that area of the law which can best be described as the 'trade secret quagmire'.") *Id.* at 607.

say that the district court's conclusion that this type of customer information is not generally known nor readily ascertainable is clearly erroneous.[9] *Bryan v. Kershaw,* 5 Cir.1966, 366 F.2d 497, 499; *See also* R. Callman, The Law of Unfair Competition, Trademarks, and Monopolies § 14.31 at 109.

■ Nor can we say on the basis of this record that the district court's finding that Reed and Poncik used the list is clearly erroneous. The majority of American Stockman's customers had been customers of Temple Tag. Since Temple Tag controlled only seven percent of the market for feeder ear tags, the trial judge could have inferred that Poncik and Reed used the list to solicit customers for American Stockman.

### III.

■ Equitable relief in the form of a permanent injunction is a proper remedy for the breach of a confidential relationship. *Hyde Corp. v. Huffines,* 1958, 158 Tex. 566, 314 S.W.2d 763, 778, *cert. denied,* 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 148; *see also* Comment, *Trade Secrets in Texas—The Employer's Rights in the Absence of Contractual Protection,* 17 S.Tex.L.J. 132, 144–45 (1975). Thus, the equitable relief awarded by the district court was proper. If the use of trade secrets results in economic injury to the employer, an award of actual damages is also a proper remedy. *K & G Oil Tool & Service Co. v. G & G Fishing Tool Service,* 1958, 158 Tex. 594, 314 S.W.2d 782. Punitive damages are available as well if the defendant's actions are fraudulent or malicious. R. Callman, The Law of Unfair Competition, Trademarks, and Monopolies § 14.45 (4th Ed.1982). Here the defendants were key employees who violated the employer's trust. The district court properly awarded exemplary damages. Reed, Poncik, and American Stockman argue that part of the award for actual damages should be disallowed because it is based on an allegedly invalid non-competition agreement. We do not find it necessary to reach the validity of that agreement

because we find that the total award is supported by the breach of the confidential relationship.

The district court awarded Zoecon Industries $305,148 for lost sales resulting from the breach of the confidential relationship. According to the district court's conclusions of law, this amount was based only on the breach of the confidential relationship. The punitive damages and attorneys' fees and costs were also awarded solely on the theory of the breach of confidential relationship. We sustain this portion of the district court's damage award.

■ The district court also awarded $99,908 for expenses associated with the promotional campaign. This award was supported by two theories, breach of the confidential relationship and breach of the non-competition agreement. The district court, however, did not apportion the damages between the two violations; instead, it noted that the "Buy 5 Tags, Get 2 Tags Free" promotional campaign could have been avoided only if neither the confidential relationship nor the non-competition agreement had been breached. The district court found that the use of Temple Tag's trade secrets enabled American Stockman to compete with Zoecon, necessitating the promotional campaign. The promotional expenses, therefore, were properly awarded for a breach of the confidential relationship. Similarly, the award for salary expense was based on either theory, and is fully supported by the breach of confidential relationship. We do not have to reach the issue of the validity of the non-competition agreement under Texas law because no part of the damage award rested solely on that theory.

The judgment of the district court is AFFIRMED.

---

**9.** Our decision is not inconsistent with *Mercer v. C.A. Roberts Co.,* 5 Cir.1978, 570 F.2d 1232. In *Mercer,* the district court found that the information at issue could be obtained from

other sources, and, therefore, did not constitute a trade secret. *Id.* at 1239. As in the case at bar, we concluded that the district court's finding of fact was not clearly erroneous.