### LAWFINDERS ASSOCIATES, INC., et al., Plaintiffs,

v.

### LEGAL RESEARCH CENTER, INC., Defendant.

### No. Civ.A. 3:98–CV–1766–D.

United States District Court, N.D. Texas, Dallas Division.

Nov. 4, 1998.

Publication ordered, Aug. 24, 1999.

---

**416**

Lisa H. Meyerhoff and Stephen J. Wyse of Jenkens & Gilchrist, P.C., Dallas, TX, for plaintiffs.

Matthew K. Davis and Jay E. Stuemke of Zelle & Larson, L.L.P., Dallas, TX, and Jeff I. Ross of Zelle & Larson, LLP, Minneapolis, MN, for defendant.

## MEMORANDUM OPINION AND ORDER

FITZWATER, District Judge.

In this action for misappropriation of trade secrets, breach of contract, false designation of origin, and dilution of a service mark, plaintiffs Lawfinders Associates, Inc., a Texas corporation, Lawfinders Associates, Inc., a New York corporation, and Lawfinders Associates, Inc., a Delaware corporation (collectively, "LF") apply for a preliminary injunction against defendant Legal Research Center, Inc. ("LRC"). For the reasons that follow,[1] the court denies the application and dissolves the temporary restraining order entered by a Texas state court prior to removal.

### I

LF and LRC compete in the market to provide legal research and brief writing services to attorneys, law firms, and corporate legal departments. From June 1997 to February 1998 they engaged in extended merger discussions, during which LF revealed to LRC what it deemed to be confidential and proprietary information.[2] The parties reached an agreement in principle, but did not consummate a formal merger. LF asserts that LRC began using and publicly disclosing LF's confidential and proprietary information almost immediately after the merger failed, and that LRC is infringing LF's GUARANTEED APPELLATE BRIEF PROGRAM service mark.

---

1. LF's application is before the court for consideration on depositions, affidavits, and briefs, pursuant to Fed.R.Civ.P. 43(e). As permitted by Rule 52(a), the court sets out in this memorandum opinion and order its findings of fact and conclusions of law.

2. The parties entered into a confidentiality agreement before commencing in-depth negotiations. As discussed below, this agreement excluded from the definition of "Proprietary Information" information that was in the public domain. *See* Ps.App. at 611.

LF asserts that it primarily offers a unique and distinctive combination of services under its GUARANTEED APPELLATE BRIEF PROGRAM service mark, consisting of preparing appellate briefs for a flat fee, arranging financing of appellate legal fees, and offering a results-based guarantee. LRC principally offers legal research and writing support services to attorneys, including research, legal memoranda, and trial and appellate brief services. After the proposed merger failed, LRC decided to "aggressively develop, emphasize and promote its 20–year old appellate brief service." D.Resp. at 13. LRC "determined to meet features offered by several competitors by providing a results-based guarantee and an offer to help arrange financing in providing this service." *Id.* LRC named its appellate brief service LRC'S GUARANTEED APPELLATE BRIEF SERVICE. LF maintains that LRC used the confidential information revealed in the merger discussions to build its appellate brief service. LF identifies *inter alia* language in its retainer letter that appears in substantially similar form in LRC's retainer letter.

LF sues LRC on claims for misappropriation of trade secrets; breach of contract; false designation of origin under § 43(a) of the Lanham Act, 15 U.S.C § 1125(a); and dilution of its service mark under the Texas Anti–Dilution Act, Tex.Bus. & Com. Code Ann. § 16.29 (West Supp.1998). LF asks this court to enjoin LRC from (1) marketing or selling legal research and writing services utilizing a results-based guarantee tied to the success or failure of a particular case; (2) utilizing or disclosing LF's fixed-fee pricing formula or any of the information contained in that formula to quote fixed fees in connection with the offering of legal research and writing services; (3) offering to finance or arranging to finance the cost of an appeal utilizing LF's proprietary asset-based financing strategy; (4) accepting any legal research or brief writing engagements obtained through the use of the foregoing acts, including engagements of any type generated from or through mailing or other offer

of a results-based guarantee; and (5) using LF's service mark GUARANTEED APPELLATE BRIEF PROGRAM or any confusingly similar mark in connection with legal research or writing services.

## II

 To obtain a preliminary injunction, LF must establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury outweighs any damage the order might cause to the defendant; and (4) that the injunction will not disserve the public interest. *Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 777 F.Supp. 1349, 1353 (N.D.Tex.) (Fitzwater, J.) (citing *Canal Auth. of State of Fla. v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974)), *aff'd,* 948 F.2d 1286 (5th Cir.1991) (per curiam) (table). A preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci,* 862 F.2d 1209, 1211 (5th Cir. 1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir.1985)).

The court holds that LF has failed to establish a substantial likelihood of success on the merits of any of its claims. Therefore, the court need not address any other factors in the four-part formulation.

## III

LF contends that it divulged to LRC the following information that is protected as a trade secret under the confidentiality agreement and/or Texas law: (1) the formulation of LF's results-based guarantee, (2) LF's fee financing program, (3) LF's risk management formulations, and (4) LF's direct marketing strategy.

## A

 To establish a trade secret misappropriation claim under Texas law, LF

must demonstrate (1) the existence of a trade secret, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, (3) use of the trade secret without authorization from the plaintiff, and (4) damages. *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir. 1991), *aff'd*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *H.E. Butt Grocery Co. v. Moody's Quality Meats, Inc.*, 951 S.W.2d 33, 34 (Tex.App.1997, writ requested). Because LF cannot establish the existence of a trade secret, the court need not address the other elements.

■ A trade secret is defined as any formula, pattern, device, or compilation of information used in a business, that gives the owner an opportunity to obtain an advantage over competitors who do not know or use it. *Phillips v. Frey*, 20 F.3d 623, 628 (5th Cir.1994); *Taco Cabana*, 932 F.2d at 1123. "It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers." *Chandler v. Mastercraft Dental Corp. of Tex. Inc.*, 739 S.W.2d 460, 468 (Tex.App.1987, writ denied). It is a process or device for continuous use in the operation of a business. *Id.* Generally, a trade secret relates to the production of goods. *Id.*

■ To be protected, a trade secret must give the owner a competitive advantage. *Phillips*, 20 F.3d at 628. It "must possess at least that modicum of originality which will separate it from everyday knowledge." *Id.* (quoting *Cataphote Corp. v. Hudson*, 444 F.2d 1313, 1315 (5th Cir. 1971)).

Texas law requires that a trade secret be a "secret." *Zoecon Indus. v. American Stockman Tag Co.*, 713 F.2d 1174, 1179 (5th Cir.1983). The purported trade secret can neither be generally known by others in the same business nor readily ascertainable by an independent investigation. *Id.* A process or device may be a trade secret, however, even when others can gain knowledge of the process from studying the manufacturer's marketed product. *Phillips*, 20 F.3d at 629.

[T]he mere fact that such lawful acquisition is available does not mean that [the one accused of trade secret misappropriation] may, through a breach of confidence, gain the information in usable form and escape the efforts of inspection and analysis. The fact that a trade secret is of such nature that it can be discovered by experimentation or other fair and lawful means does not deprive its owner of the right to protection from those who would secure possession of it by unfair means.

*K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.*, 158 Tex. 594, 314 S.W.2d 782, 788 (1958) (internal quotations omitted); *see Phillips*, 20 F.3d at 629 (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974) (stating that trade secret law does not offer protection against discovery by fair and honest means such as independent invention, accidental disclosure, or reverse engineering; however, protection will be awarded to trade secret holder against disclosure or unauthorized use by those to whom secret has been confided, either under express or implied restriction of non-disclosure or by one who has gained knowledge by improper means)). Trade secret protection is based on a policy of protecting business from breaches of faith and reprehensible means of learning another's secret. *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 503 (5th Cir.1982).

■ Because a trade secret must be a secret, the owner of a trade secret must do something to protect itself. *Taco Cabana*, 932 F.2d at 1123. A key part of the definition of a trade secret is secrecy. *Gonzales v. Zamora*, 791 S.W.2d 258, 264 (Tex.App.1990, no writ); *see McGowan v. State*, 938 S.W.2d 732, 737 (Tex.App.1996) (noting that secrecy is required, and that owner must have taken measures to prevent trade secret from becoming available to persons other than those selected by owner to have access for limited purposes),

*aff'd sub nom. Weightman v. State,* 975 S.W.2d 621 (Tex.Crim.App.1998). The owner of a trade secret will lose its trade secret by disclosure unless the secret is revealed in some manner by which the owner creates a duty and places that duty on the other party not to disclose further or use the trade secret in violation of that duty. *Taco Cabana,* 932 F.2d at 1123 (citing *Furr's, Inc. v. United Specialty Advertising Co.,* 385 S.W.2d 456, 459 (Tex. Civ.App.1964, writ ref'd n.r.e.)).

■ When money and time are invested in the development of a procedure that is based on an idea that is not new to a particular industry, and when that procedure is not generally known, trade secret protection will exist. *K & G Oil Tool,* 314 S.W.2d at 785–86. Nevertheless, courts have refused to give material or a procedure trade secret protection when that which is sought to be protected has been publicly disclosed. This is so because information generally known and readily available is not protectable. *See, e.g., Gonzales,* 791 S.W.2d at 264. For example, in *Numed, Inc. v. McNutt,* 724 S.W.2d 432, 435 (Tex.App.1987, no writ), the court concluded that because the purported trade secrets were contained in contracts distributed to customers, that could be discovered by anyone, the information was not a trade secret. Likewise, in *Rimes v. Club Corp. of America,* 542 S.W.2d 909, 913 (Tex.Civ.App.1976, writ ref'd n.r.e.), the court held that certain words and phrases were not trade secrets where there was no effort to keep them secret and the words and phrases were frequently used in soliciting clients. *See Sheets v. Yamaha Motors Corp., U.S.A.,* 849 F.2d 179, 183–84 (5th Cir.1988) (holding that disclosure of trade secret to one who had no obligation of confidentiality extinguished any property right in that trade secret).

On at least one occasion, this court has held that where it appeared an alleged trade secret misappropriator possibly obtained the purported trade secret in an improper manner or through a breach of an implied duty of confidentiality, it was unnecessary to resolve whether the defendant had discovered the trade secret by improper means, because the information the defendant obtained was not substantially likely to have constituted a trade secret. *Adelphon, Inc. v. DiRico,* 1992 WL 281395, at *2 (N.D.Tex. Mar.26, 1992) (Maloney, J.). In *Adelphon* Judge Maloney wrote:

> Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others.... If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.

*Id.* (quoting *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)). Judge Maloney concluded that any property right the plaintiff may have had in the use and shape of his product had been extinguished through public disclosure to prospective purchasers at trade shows and by constructing the product in full view of the public. *Id.* at *3.

"Where a process or idea is so common, well known, or readily ascertainable that it lacks all novelty, uniqueness and originality, it necessarily lacks the element of privacy necessary to make it legally cognizable as a trade secret." *Cataphote Corp.,* 444 F.2d at 1315–16. The Fifth Circuit has held:

> A duty not to use an idea already known cannot be created by virtue of the fact that one makes a confidential disclosure of that idea. If the rule were not so restricted it is obvious that by disclosing an idea under delusions of confidence, the person making the disclosure thereafter could prevent the confidante from subsequently making use of it, even though the idea was well known prior to the date of the disclosure and open to the use of all others in the world.

*Id.* at 1316 (quoting *Smoley v. New Jersey Zinc Co.,* 24 F.Supp. 294, 300 (D.N.J.1938), *aff'd* 106 F.2d 314 (3d Cir.1939)) (internal citation omitted); *see Luccous v. J.C. Kinley Co.,* 376 S.W.2d 336, 340 (Tex.1964) ("We hold that the plaintiff has no 'trade secret' for this court to protect, and the equitable remedy of injunction should not be employed to prevent defendants from using the information and knowledge they gained under the licensing agreement to build sand-line cutters, such information having been available to all the world sixteen years prior to the parties' contract.").

In *K & G Oil Tool* the Texas Supreme court quoted at length from *Smith v. Dravo Corp.,* 203 F.2d 369, 374 (7th Cir.1953), and noted that the court's function in a case involving misappropriation of trade secrets is that of condemning the employment of improper means to procure a trade secret. *K & G Oil Tool,* 314 S.W.2d at 788. The court stated that this is the appropriate inquiry: "How did defendant learn of the plaintiffs' design?" *Id.* at 787. Further, the *K & G Oil Tool* court agreed that "[t]he mere fact that the means by which a discovery is made are obvious ... cannot ... advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtain[s] the desired knowledge without himself paying the price in labor, money, or machines expended by the discoverer." *Id.* at 788 (quoting *A.O. Smith Corp. v. Petroleum Iron Works Co.,* 73 F.2d 531, 538 (6th Cir.1934)). The *K & G Oil Tool* court distinguished, however, between simple, widely circulated devices and complex apparatuses. *Id.* at 788 ("Here was no simple device, widely circulated, the construction of which was ascertainable at a glance. If such were the

case, our problem would be simple. Instead, we are concerned with a relatively complex apparatus[.]" (citations omitted)). The court then noted that the purported trade secret at issue did not involve "a simple and obvious device" like that in *Northup v. Reish,* 200 F.2d 924 (7th Cir. 1953), or *Wissman v. Boucher,* 150 Tex. 326, 240 S.W.2d 278 (1951), where the respective courts found no trade secret to exist.[3] *K & G Oil Tool,* 314 S.W.2d at 790. The *Northup* court held that the aluminum oven liners marketed by the plaintiff were not trade secrets because of their "simple use which was necessarily fully disclosed to the public by the plaintiff when he marketed his oven liners." *Northup,* 200 F.2d at 927. The fact that the plaintiff had previously disclosed in confidence the purported trade secret to the defendant was not controlling. *Id.* at 926–27. The court stated:

The containers in which plaintiff's oven liners were sold told the public everything that the plaintiff had told [the defendant] about the oven liners. After the liners had been so marketed the plaintiff no longer had any secret about their composition, their style of embossment, their size, their shape, the method of their use, nor their disposal after they were too soiled for further use.

*Id.* at 927. Likewise, the *Wissman* court, finding that a fishing pole that collapsed into a walking stick was not a trade secret, held:

It seems clear enough that, even making the doubtful assumption of novelty in plaintiff's idea, his pole is based on familiar mechanical means and principles that are quite obvious to and easy to

---

**3.** *K & G Oil Tool* is distinguishable from the present case on its facts. There the plaintiffs, who designed a magnetic oil field tool, never disclosed to any person, other than employees and others in a confidential relationship, the internal construction of the tool. *Id.* at 786. The plaintiffs entered into a licensing agreement with the defendants whereby the defendants agreed to sublease the tool for a royalty based on rentals charged. *Id.* at 785. The contract provided that during the time the

defendants were handling the tool, no one was to disassemble it. *Id.* at 786. Despite the agreement, the defendants disassembled the tool and made a substantially similar one. *Id.* Before that time, the internal construction of the tool was not known to persons engaged in the oil well fishing tool business. *Id.* In the present case, by contrast, LF had publicly disclosed its purported trade secret in its retainer letters and a magazine article.

imitate by any reasonably experienced machinist that might see one for the first time or purchase it on the open market. Under these latter circumstances, the exposure of the device to the public by advertisement or sale definitely operates to destroy any legal protection the claimed originator might otherwise assert on the basis of a trade secret. . . . Matters which are completely disclosed by the goods which one markets cannot be his secret.

*Wissman*, 240 S.W.2d at 279–80.

LF points to the principle that protection of trade secrets is not based on the policy of rewarding or otherwise encouraging the development of secret processes or devices. Instead, the protection is merely against breach of faith and reprehensible means of learning another's secret. *See, e.g., FMC Corp.*, 677 F.2d at 502. Today's opinion is not inconsistent with these decisions, which assume the existence of a trade secret and focus on the second element of a misappropriation claim—the requirement that the defendant acquire the trade secret through breach of a confidential relationship or discover it by improper means. *See, e.g., id.* at 503 ("The fact that a *trade secret* is of such a nature that it can be discovered by experimentation or other fair and lawful means does not deprive its owner of the right to protection from those who would secure possession of it by unfair means." (emphasis added) (citations omitted)); *T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 21 (Tex.App.—Hous. 1 Dist. 1998, pet.dism'd) ("When a claim of improper disclosure or use of *trade secrets* arises from a confidential relationship, the injured party is not required to rely upon an express agreement that the offending party will hold the *trade secret* in confidence. However, the [injured party] must show that the information was, in fact, a *trade secret.*") (emphasis added) (citations omitted); *Chandler*, 739 S.W.2d at 469 ("We hold therefore that the appellees did

not have to prove a substantial element of secrecy in order to recover damages for conversion of trade secrets. The type of *trade secrets* involved in this case . . . are a protectable interest of the buyer when the seller breached his duty of confidence.") (emphasis added); *Brown v. Fowler*, 316 S.W.2d 111, 115 (Tex.Civ.App.1958, writ ref'd n.r.e.) ("The rule to be deduced from the authorities seems to be that one who has a *secret* formula or process has a property right therein, which, though it may be lost should one rightfully acquire knowledge of it, will be protected as against those who through breach of trust or violated confidence, attempt to apply the *secret* to their own use.") (emphasis added).

### B

### 1

The court first addresses whether LF's formulation of its results-based guarantee[4] is a trade secret. This determination hinges on whether the formulation was in the public domain at the time LF provided this information to LRC.

LF asserts that the guarantee is unique because it offers a refund of the cost of the briefing services performed only upon the occurrence of a decision entirely adverse to the customer-party. LF contends that the guarantee is a trade secret because of the significant research and development underlying the specific formulation and because the formulation gives LF a competitive advantage. LF argues that the specific formulation cannot be found in the public domain and its details cannot be gleaned from LF's advertising.

■ The court finds that LF's formulation of its results-based guarantee was in the public domain at the time LF revealed the guarantee to LRC. Consequently, it is not a trade secret. *See Zoecon*, 713 F.2d at 1179 (stating that trade secret must be a secret and not readily ascertainable by

---

4. LF alleges that the information that it will honor its results-based guarantee "only when the appellate court decides against a party in

its entirety" is a trade secret. Ps.Br. at 20. This information appears in LF's retainer letters.

an independent investigation). Public domain is a legal concept. *Reingold v. Swiftships, Inc.,* 126 F.3d 645, 652 (5th Cir. 1997). Matter is in the public domain only if no intellectual property law, such as trade secrets, protects it. *Id.* Trade secret protection does not extend to information disclosed to others who have no duty of non-disclosure or duty of confidentiality. *Ruckelshaus,* 467 U.S. at 1002, 104 S.Ct. 2862.

■ By including the results-based guarantee in retainer letter agreements distributed to its customers, *see* Ps.App. at 8–9, 15–18, LF placed the guarantee in the public domain. LF has produced no evidence that its customers have a non-disclosure obligation or a duty of confidentiality with respect to the retainer letters. "Matters which are completely disclosed by the goods which one markets cannot be his secret." *Wissman,* 240 S.W.2d at 280; *see Ruckelshaus,* 467 U.S. at 1002, 104 S.Ct. 2862 ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished."). Because LF's results-based guarantee is not a protected trade secret, the court concludes that LF is not likely to succeed on the merits as to this ground for its claim for misappropriation of trade secrets.

### 2

LF next contends that its fee financing program[5] is a trade secret. LF argues that its unique program involving a triangular transaction among the client, LF, and a third-party financing institution, secured by LF's results-based guarantee, is not public knowledge. LRC counters that to the extent LF has disclosed a fee financing program to LRC at all, that disclosure contained no more information than that which was already in the public domain at the time of the merger negotiations.

LRC has demonstrated that the details of LF's fee financing program were in the public domain at the time LF revealed information on that subject to LRC. Robert J. Scott ("Scott"), LF's chief executive officer, authored an article that appeared in *Legal Times* entitled, "Finding Funding for Your Appeal." D.App. at 17. The article discusses in depth a three-part arrangement regarding asset-based financing substantially similar to the arrangement that LF now asserts is confidential. *Id.* Because information regarding LF's fee financing program was in the public domain, LF is not entitled to trade secret protection.

### 3

■ LF argues that its risk management formulations constitute trade secrets. The two risk management formulations that LF seeks to protect are: (1) the information that it is important to comply with ethical obligations and, therefore, an appellate brief service should contract directly with the attorney on a brief and avoid a relationship or dealings with the attorney's client; and (2) the information that a guarantee program reduces the customer's reluctance to pay in full in advance.

The court finds that the first formulation is not a trade secret. LRC has presented evidence prepared well before any merger discussions that "[i]n rendering their services neither LRC nor its research attorneys practice law, and they have no direct contact with and render no legal advice to the requesting attorney's client." D.App. at 65. LRC has also stated that "[i]t has no client contact." *Id.* at 72. Additionally, LRC's work product "is prepared solely for review by the lawyer utilizing the Legal Research Center." *Id.* Because, before the merger discussions, LRC sought

---

5. The LF fee financing program formulation is found in its retainer agreement:
 At your request, we have contacted a third-party financing source who will provide the financing necessary to cover our fees.... In the event that such financing is not provid[ed] on terms acceptable to you, this retainer will be automatically canceled.
 Ps.Br. at 21.

to avoid ethical dilemmas by generally contracting with the requesting attorney and avoiding relationships with the attorney's client, the court concludes that this information was not a trade secret. LRC already knew of and used the information.

The court declines to enjoin LRC with respect to the second formulation because LF has introduced no evidence that LRC is using this information in any way. *See Controls Int'l, Inc. v. Kinetrol, Ltd.*, 1998 WL 158678, at *8 (N.D.Tex. Mar.25, 1998) (Fitzwater, J.) ("This evidence is not sufficient to support a finding that [the plaintiff] is likely to succeed on the merits of its claim for misappropriation of trade secrets."). Rather, LRC has demonstrated that it has for many years had a policy of requiring a substantial, but generally partial, advance payment. Ps.App. at 239.

### 4

LF contends that its direct response market strategy, using free evaluations and fixed fee pricing, coupled with its specific results-based guarantee, constitutes a trade secret. The court disagrees. Scott testified that since 1994, LF has publicly disclosed the following information:

> Lawfinders' business model employs unique methods of *marketing*, selling, and delivering legal research and writing services. The *publicly disclosed aspects* of these methods include: (1) utilization of *direct response advertising* encouraging attorneys with potential matters on appeal to obtain a *free evaluation* of the merits of their case without cost or obligation; (2) utilization of *fixed fees* which are all inclusive and quoted and agreed to before work on the project is commenced; and (3) utilization of a *results-based guarantee* which is made available on certain matters that meet the company's underwriting requirements. *Since 1994*, Lawfinders has been marketing this unique mix of services to members of the bar. . . .

Ps.App. at 2 (emphasis added). In view of the testimony that the direct response market strategy has been publicly disclosed since 1994—approximately four years before the merger discussions—the court declines to enjoin LRC from utilizing information in the public domain.

### 5

LF finally argues that the "unique combination of elements in its business model" affords it a competitive advantage, Ps.Rep. at 9, and the combination is a protectable trade secret. *See Metallurgical Industries Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1202 (5th Cir.1986) (providing that trade secret can exist in combination of characteristics and components each of which, by itself, is in the public domain, but unified process, design, and operation of which in unique combination affords competitive advantage). The court disagrees. As discussed above, the entire combination of services has been publicly revealed in LF's marketing and publicity and is in the public domain. Each of the purported trade secrets stands on its own, that is, each purported trade secret does not necessarily rely on another purported trade secret to be useful.

### IV

LF seeks injunctive relief for breach of a confidentiality agreement between LF and LRC. To establish a breach of contract, LF must show the existence of a valid contract and a breach. *Wright v. Christian & Smith*, 950 S.W.2d 411, 412 (Tex.App.1997, no writ). The relevant provision of the agreement in this case involves the disclosure or use of proprietary information. Specifically, "[b]oth parties acknowledge and agree that Proprietary Information which it receives is proprietary to and a valuable trade secret of the other party and that any disclosure or use other than as authorized in this Agreement will cause irreparable harm and loss to the disclosing party." Ps.App. at 612. Proprietary Information is defined as "(i) information furnished by either party to the other party, and (ii) all other information (either written or oral) furnished by either party to the other party which is described as proprietary or confidential by the disclosing party upon delivery thereof to the

receiving party." *Id.* at 611. The confidentiality agreement provides that proprietary information does not include

any information which: (i) is in the public domain at the time communicated to the receiving party; (ii) is obtained by the receiving party, with permission to disclose, from a third party not to the receiving party's knowledge subject to a contractual or fiduciary duty not to disclose; (iii) has been independently derived by the receiving party without reference to Proprietary Information; (iv) the receiving party can demonstrate was lawfully in its possession free of any duty to the disclosing party before the date of the disclosure to the receiving party by the disclosing party; or (v) is in the receiving party's possession at the time of disclosure.

*Id.*

LF contends that LRC breached the confidentiality agreement by using and disclosing proprietary and confidential information consisting of the formulation of LF's results-based guarantee, fee financing program, risk management formulations, and direct marketing strategy. LRC argues that each of the items of information LF claims is proprietary information was clearly in the public domain at the time the information was communicated to LRC or already in LRC's possession at the time of disclosure.

■■■ The court concludes that LF has not demonstrated a substantial likelihood that it will succeed on the merits of its breach of contract claim. The confidentiality agreement provides that proprietary information does not include information in the public domain. *Id.* The court has already held that the formulation of LF's results-based guarantee, fee financing program, and direct marketing strategy were in the public domain at the time they were communicated to LRC. This information was not proprietary information, as used in

the agreement, and LRC was not contractually prohibited from using or disclosing the information. LF has failed to establish a substantial likelihood of success on the merits of its breach of contract claim with respect to these three alleged trade secrets.

The confidentiality agreement also provides that proprietary information does not include information that is in the receiving party's possession at the time of the disclosure. *Id.* With respect to the risk management formulation that it is important to comply with ethical obligations and, therefore, an appellate brief service should contract directly with the attorney on a brief and avoid a relationship or dealings with the attorney's client, the court has already found that LRC has for several years avoided direct relations with clients. The court finds that the concepts that this risk management formula espouses were in LRC's possession at the time LF disclosed the formulations to LRC. Thus this risk management formula was not proprietary information under the agreement. With respect to LF's other risk management formulation, LF has shown no evidence that LRC has ever used the information that a guarantee program reduces the customer's reluctance to pay in full in advance. LRC cannot be liable for breach of the confidentiality agreement in this respect because LRC has neither disclosed nor used this risk management formulation.

Because the information LF asserts was proprietary information under the confidentiality agreement was either in the public domain or in LRC's possession at the time of disclosure, the information was expressly excluded from the definition of proprietary information.[6] LRC was not prohibited from disclosing or using the information. LF has failed to show a substantial likelihood that it will succeed on the merits of its breach of contract claim.[7]

---

6. Because the information was not proprietary information, it did not constitute a trade secret under the express terms of the agreement, as LF contends. *See* Ps.App. at 612.

7. LRC contends that LF's extreme interpretation of the confidentiality agreement renders its terms an invalid restraint on competition. The court need not address this issue.

## V

The court now considers LF's false designation of origin claim, brought pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## A

LF seeks protection for its GUARANTEED APPELLATE BRIEF PROGRAM service mark. Registration has been filed for the mark, and it has been in use since 1994. Ps.Br. at 26. LF asserts that LRC has used similar marks in marketing its services, including *inter alia* the phrases GUARANTEED APPELLATE BRIEF SERVICE, GUARANTEED APPELLATE BRIEFS, and YOU WIN YOUR CASE OR YOUR MONEY BACK.

*Security Center, Ltd. v. First National Security Centers*, 750 F.2d 1295 (5th Cir. 1985), provides guidance on trademark claims:

> Trademark cases often involve line drawing in areas that are inherently fuzzy. This case is no exception. In order to bring these indistinct lines into better focus, this circuit has reduced the inquiry to two basic questions. The first is whether the plaintiff has a protectable property right in the name it seeks to defend from use by others. The second question—and the ultimate issue—is infringement, as judged by likelihood of confusion. Only when a trademark rises to the level of trademark protectability—either by a showing that it is sufficiently distinctive or has acquired secondary meaning—does the question of likelihood of confusion become relevant.

*Id.* at 1298 (citations and internal quotations omitted). Courts use the same considerations for service mark infringement claims as for trademark infringement claims. *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 191 n. 1, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) (providing that Lanham Act generally applies the same principles concerning protection to both trade and service marks).

To prevail on its claim for service mark infringement, LF must show (1) that its GUARANTEED APPELLATE BRIEF PROGRAM service mark is eligible for protection, and (2) that there is a likelihood of confusion in the minds of potential consumers between LF's use of the GUARANTEED APPELLATE BRIEF PROGRAM service mark and LRC's use of GUARANTEED APPELLATE BRIEF SERVICE and GUARANTEED APPELLATE BRIEFS. *See Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 536 (5th Cir.1998); *Brandtjen & Kluge, Inc. v. Prudhomme*, 765 F.Supp. 1551, 1564 (N.D.Tex.1991) (Fitzwater, J.) (citing *Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 844 (5th Cir.1990)). For the following reasons, the court concludes that LF has not shown a substantial likelihood of success on the merits of its Lanham Act claim.

To determine whether the GUARANTEED APPELLATE BRIEF PROGRAM service mark is eligible for protection, the court must analyze the strength of the mark. "The strength and distinctiveness of the mark adopted is a key consideration in deciding how much protection should be afforded to the mark." *Minturn Adver., Inc. v. Hermsen Design Associates, Inc.*, 728 F.Supp. 430, 432 (N.D.Tex.1990) (Fitzwater, J.) (citing *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259 (5th Cir.1980)).

Marks are categorized as generic, descriptive, suggestive, or arbitrary or fanciful. *Union Nat'l Bank*, 909 F.2d at 844. "These categories are not discrete, however, but instead describe points on a spectrum ranging from strong to weak." *Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1433 (S.D.Ohio 1990). "[A] mark may fall within the hazy area between two categories." *Id.* The proper characterization of a mark is a question of fact. *Union Nat'l Bank*, 909 F.2d at 846; *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 793 (5th Cir.1983).

Fanciful and arbitrary marks are the strongest types of marks. *Little Caesar*

Enters., Inc. v. Pizza Caesar, Inc., 834 F.2d 568, 571 (6th Cir.1987); *Minturn Adver.*, 728 F.Supp. at 432. "[A]rbitrary and fanciful terms or phrases are those which are either coined words or words which are not suggestive of the product or service." *Union Nat'l Bank*, 909 F.2d at 845. "The marks 'Kodak' and 'Xerox' are such marks." *Minturn Adver.*, 728 F.Supp. at 432 (citing *Amstar*, 615 F.2d at 259). "A 'fanciful' mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned. . . ." *Worthington Foods*, 732 F.Supp. at 1433 (quoting *Little Caesar Enters.*, 834 F.2d at 571). Arbitrary "refers to ordinary words which do not suggest or describe the services involved." *Union Nat'l Bank*, 909 F.2d at 845. "The greatest protection extends to marks that are purely arbitrary or fanciful and bear no relation to the products or services sold under the mark." *Minturn Adver.*, 728 F.Supp. at 432.

A suggestive mark suggests, rather than describes, some particular characteristic of a good or service but requires the consumer to draw a conclusion as to the nature of the goods and services. *Union Nat'l Bank*, 909 F.2d at 845. It is entitled to a narrower range of protection than is an arbitrary mark. *Minturn Adver.*, 728 F.Supp. at 432. A descriptive term "identifies a characteristic or quality of the article or service." *Union Nat'l Bank*, 909 F.2d at 845 (internal quotations omitted). It is entitled to even less protection. *See Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir.1980). A generic mark is the weakest type on the spectrum. *Worthington Foods*, 732 F.Supp. at 1433. It is a term commonly used as the name or description of a kind of goods, and cannot be trademarked. *Id.*

### B

■ The court holds that the GUARANTEED APPELLATE BRIEF PROGRAM service mark fits within either the generic or descriptive categories. In making this finding, the court looks to how the term is used with other words, the prod-

ucts to which it is applied, and the audience to which the product is directed. *Union Nat'l Bank*, 909 F.2d at 847. LF does not assert that its GUARANTEED APPELLATE BRIEF PROGRAM service mark is arbitrary or fanciful. It argues instead that it is "at least suggestive in quality." Ps.Rep. at 15. The GUARANTEED APPELLATE BRIEF PROGRAM service mark does not fit well within the suggestive category. Suggestive terms require imagination in order to draw a conclusion as to the nature of the product. *Union Nat'l Bank*, 909 F.2d at 845. A consumer needs no imagination to conclude from the mark that LF provides an appellate brief writing service with an associated guarantee. Rather, the GUARANTEED APPELLATE BRIEF PROGRAM service mark is either descriptive or generic.

The distinction between descriptive and generic terms is necessarily one of degree. *Soweco*, 617 F.2d at 1184. Judge Learned Hand defined the test to determine genericness as follows: "The single question, as I view it, in all these cases, is merely one of fact: What do the buyers understand by the word for whose use the parties are contending?" *Bayer Co. v. United Drug Co.*, 272 F. 505, 509 (S.D.N.Y.1921). "The appropriate test for genericness is whether the public perceives the term primarily as the designation of the article." *Credit Counseling Ctrs. of Am. v. National Found. for Consumer Credit, Inc.*, 1997 WL 160180, at *2 (N.D.Tex. Apr.1, 1997) (Fitzwater, J.).

LRC has demonstrated some evidence that the mark GUARANTEED APPELLATE BRIEF PROGRAM is generic. A generic mark is never protected because it connotes "a particular genus or class of which an individual [product] or service is but a member . . ., rather than the more individualized characteristics of a particular product." *Pebble Beach*, 155 F.3d at 540 (quoting *Zatarains*, 698 F.2d at 790). A generic mark suggests the basic nature of articles or services. *Mid City Bowling*

*Lanes & Sports Palace, Inc. v. Don Carter's All Star Lanes–Sunrise, Ltd.,* 1997 WL 563993, at *3 (E.D.La. Sept.8, 1997). In LF's petition it "seeks issuance of an order ... restraining [LRC] from offering *any form* of *guaranteed appellate brief program....*" Ps.App. at 698 (emphasis added). LF's own words provide some indication that the mark is generic. *See Worthington Foods,* 732 F.Supp. at 1433 (stating that generic mark is term commonly used as name or description of kind of goods). As a generic mark, LF is entitled to no protection, and LRC has not violated the Lanham Act by using the phrase GUARANTEED APPELLATE BRIEF SERVICE.

Assuming *arguendo* that the mark is descriptive, LF nevertheless fails to establish a substantial likelihood of success on its Lanham Act claim. A mark is descriptive if it "identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients." *Pebble Beach,* 155 F.3d at 540 (quoting *Zatarains,* 698 F.2d at 790). Descriptive terms identify a characteristic or quality of the service. *Union Nat'l Bank,* 909 F.2d at 845. A descriptive mark is protectable only when it has "acquir[ed] a secondary meaning in the minds of the consuming public." *Pebble Beach,* 155 F.3d at 540 (quoting *Zatarains,* 698 F.2d at 790). LF's mark is arguably descriptive because it "identifies a characteristic or quality" of the service. *Union Nat'l Bank,* 909 F.2d at 845. Descriptive marks are entitled to little protection. *See Soweco,* 617 F.2d at 1183; *see also Minturn Adver.,* 728 F.Supp. at 433 ("A court should not give a high level of protection to marks that are some degree communicative because doing so hampers competitors in their ability to best promote their product or service."). A plaintiff seeking protection of a descriptive mark must demonstrate the mark has acquired "secondary meaning" by showing that customers will believe the alleged infringing service is in fact being offered by the service mark owner. *See Thompson Med. Co. v. Pfizer Inc.,* 753 F.2d 208, 215–16 (2d Cir.1985).

The court considers the following evidence to determine whether a particular mark has acquired a secondary meaning: (1) length and manner of use of the mark, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the mark. *Pebble Beach,* 155 F.3d at 541. The focus is on how the evidence demonstrates that the meaning of the mark has been altered in the minds of consumers. *Id.* "While each of these types of evidence alone may not prove secondary meaning, in combination they may indicate that consumers consider the mark or trade dress to be an indicator of source." *Id.*

LF has failed to make the necessary showing of secondary meaning. LF posits:

> There is ample evidence in the record to demonstrate that [LF's] mark has acquired a secondary meaning—that the consuming public associates the mark exclusively with [LF]. [LF] has used the mark for over four years and prominently displays the mark in brochures that [LF] has distributed by the hundreds of thousands to attorneys throughout the United States.

Ps.Rep. at 15. These are two methods to attempt to show secondary meaning: length and manner of use of the mark and manner of advertising. LF also attempts to show secondary meaning through two consumer affidavits. Garran Graner ("Graner") testified that he "specifically associate[s] the use of the slogans 'guaranteed appellate brief program,' 'brief wins or your money back,' and '100% money back,' with [LF]." Ps.App. at 42. Graner's affidavit appears to show that LF's mark has acquired a secondary meaning; however, the second affidavit by Bernard Burton ("Burton") indicates otherwise. Burton, LF's own attorney, testifies that "I specifically associate a *Guarantee Program on appeals* with [LF]." Ps.App. at 33 (emphasis added). The fact that "a Guarantee

Program on appeals" is associated with LF tends to demonstrate the generic nature of LF's mark GUARANTEE APPELLATE BRIEF PROGRAM, and reflects the absence of secondary meaning. LF's evidence fails to show that LF can establish that relevant consumers associate the mark exclusively with LF. *See Pebble Beach*, 155 F.3d at 541 (stating that focus is on how meaning of mark has been altered in minds of consumers). The fact that only one of two consumers whom LF produced as witnesses associated the GUARANTEED APPELLATE BRIEF PROGRAM service mark only with LF fails to demonstrate that four years of use of this mark and the thousands of advertising brochures that included the mark altered the meaning of the mark in the minds of consumers. LF has not established that its service mark has a secondary meaning. Without such a showing, a descriptive mark is not protectable.

LF has failed to show a substantial likelihood of success on the merits because it cannot demonstrate that its mark is protectable.[8]

## VI

LF finally seeks injunctive relief under the Texas Anti–Dilution Act, which provides, in pertinent part:

> A person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under this chapter or Title 15, U.S.C., or a mark or trade name valid at common law, regardless of whether there is competition between the parties or confusion as to the source of goods or services. . . .

Tex.Bus. & Com.Code Ann. § 16.29 (West Supp.1998). The district court in *Pebble Beach* provided some guidance on interpretation of anti-dilution statutes:

> The purpose of an anti-dilution statute is to prevent the gradual "whittling away"

of a party's distinctive trademark or trade name. In order to establish a dilution claim, the plaintiff must show (1) ownership of a distinctive mark and (2) a likelihood of dilution. A likelihood of dilution may be shown under two separate theories: dilution by "blurring" or "tarnishment."

*Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F.Supp. 1513, 1564 (S.D.Tex.1996) (citations omitted), *aff'd as modified*, 155 F.3d 526 (5th Cir.1998).

To recover for dilution, LF must first show that its service mark is distinctive. *Id.* In determining whether a mark is distinctive, the court considers: (1) whether the mark is arbitrary; (2) the length of time a user has employed the mark; (3) the scope of the user's advertising and promotions; (4) the nature and extent of the user's business; and (5) the scope of the first user's reputation. *Id.* at 1564–65. The *Pebble Beach* court noted that a somewhat stricter standard is to be applied in determining strength in dilution analysis than in likelihood of confusion analysis. *Id.* at 1565 (citing 3 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 24.17[2] (3d ed.1996) (noting that in dilution analysis, "more in the form of marketplace fame and recognition is needed" for a mark to be strong)).

The court concludes that LF has failed to establish a substantial likelihood of success on its anti-dilution claim. For the reasons cited above, the court finds that LF's mark is not distinctive. The court concludes that LF's mark is either generic or descriptive without a secondary meaning, each of which is far from distinctive. Moreover, § 16.29 requires the mark to be registered under chapter 16 of the Texas Business and Commerce Code or under title 15 of the United States Code,

---

**8.** Once a plaintiff's mark is found to be protectable, liability for trademark infringement hinges upon whether a likelihood of confusion exists in the minds of potential consumers as to the source, affiliation, or sponsorship of the defendant's product or service due to the use of the allegedly infringing mark. *Pebble Beach*, 155 F.3d at 536–37. The court need not address this issue.

or that it be a mark that is valid at common law. Tex.Bus. & Com.Code Ann. § 16.29 (West Supp.1998). LF has neither argued nor produced evidence that its service mark is registered under the Texas Business and Commerce Code. The court has already explained that the mark is neither protected under title 15 nor at common law because it is either a generic mark that is unprotected as a matter of law or is a descriptive mark that is unprotected because LF cannot show secondary meaning associated with the mark. Because LF has produced no evidence that it owns a distinctive or protectable mark, the court concludes that LF has failed to establish a substantial likelihood of success on its anti-dilution claim.

\* \* \* \* \* \*

LF has failed to demonstrate a substantial likelihood of success on the merits of any of its claims. Its preliminary injunction application is denied.[9]

**SO ORDERED.**

---

**9.** In its response, LRC requests partial summary judgment. *See* D.Resp. at 41. Because the motion is not briefed in the manner required by local civil rules 56.5–56.6, and because this would qualify as the single summary judgment motion that LRC can file without leave of court or unless the federal rules otherwise provide, *see* Rule 56.2(b), the court declines to consider the request.